UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **HUMANE SOCIETY OF THE UNITED STATES, WILD FISH CONSERVANCY, BETHANIE O'DRISCOLL,** and **ANDREA KOZIL,**<br><br>          Plaintiffs,<br><br>     v.<br><br>**JOHN BRYSON,** Secretary of Commerce, **SAMUEL RAUCH**, Asst. Administrator, NOAA Fisheries, and **JAMES LECKY**, Director, Office of Protected Resources,<br><br>          Defendants,<br><br>     v.<br><br>**STATE OF WASHINGTON, STATE OF OREGON,** and **STATE OF IDAHO,**<br><br>          Intervenor-Defendants. | Case No. 3:12-cv-00642-SI<br><br><br><br><br><br><br><br><br><br>**OPINION AND ORDER** |

**SIMON, District Judge.**

Plaintiffs Humane Society of the United States, Wild Fish Conservancy, Bethanie

O'Driscoll, and Andrea Kozil ("Plaintiffs" or "Humane Society") seek a preliminary injunction

prohibiting Intervenor-Defendants Washington, Oregon, and Idaho ("States" or "Intervenors")

from lethally removing individually identified California Sea Lions ("CSL") from the Columbia

River at the Bonneville Dam, pursuant to letters of authority provided by Defendants John

Bryson (the Secretary of Commerce), Samuel Rauch (Assistant Administrator of NOAA

Fisheries[1]), and James Lecky (Director of the Office of Protected Resources) ("Defendants" or

"Agency"). (Doc. 24.) The States and the Agency oppose Plaintiffs' motion for a preliminary

injunction. In addition, the Confederated Tribes of the Warm Springs Reservation of Oregon, the

Confederated Tribes of the Umatilla Indian Reservation, and the Confederated Tribes and Bands

of the Yakama Nation, each with fishing rights secured by treaty, have appeared as *amici curiae*

in opposition to Plaintiffs' motion. The Plaintiffs raise serious questions going to the merits of

their complaint. The balance of hardships and the public interest, however, do not tip sharply in

favor of Plaintiffs, which is required for the issuance of a preliminary injunction when there is

not a clear likelihood of success on the merits. *See Alliance for the Wild Rockies v. Cottrell*, 632

F.3d 1127, 1131-32 (9th Cir. 2011). Accordingly, the court denies Plaintiffs' motion for a

preliminary injunction.

## BACKGROUND

### I.    Marine Mammals Protection Act

Sea lions are pinnipeds, or aquatic carnivorous mammals with fins for limbs.[2] They are

protected under the Marine Mammals Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423H,

from unauthorized "take." Under the MMPA, to "take" a marine mammal means "to harass,

---

[1] Previously called the National Marine Fisheries Service ("NMFS").

[2] Other pinnipeds include walruses and seals.

hunt, capture, or kill, or attempt to harass, hunt, capture, or kill." *Id.* § 1362(13).[3] The MMPA includes some exceptions to this general prohibition, allowing takes of marine mammals for scientific research or incidental takes that result from commercial fishing. Central to the dispute presented in this case, Section 120 of the MMPA (codified at 16 U.S.C. § 1389) allows the Secretary of Commerce "to authorize the intentional lethal taking of individually identifiable pinnipeds which are having a significant negative impact on the decline or recovery of salmonid[4] fishery stocks" that are listed as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.,* or that the Secretary finds are approaching that status, or that migrate through the Ballard Locks of Seattle, Washington. 16 U.S.C. § 1389(b)(1). Section 120 requires a State that submits an application for such authorization to "include a means of identifying the individual pinniped or pinnipeds, and . . . a detailed description of the problem interaction and expected benefits of the taking." *Id.* § 1389(b)(2).

After a preliminary assessment of a State's application, the Secretary convenes the Pinniped-Fishery Interaction Task Force ("Task Force"). The Task Force consists of Department of Commerce employees, scientists, "representatives of affected conservation and fishing community organizations," treaty tribes, State officials, and potentially others. Following a public comment period, the Task Force provides the Secretary with a recommendation that includes "a description of the specific pinniped individual or individuals, the proposed location,

---

[3] "Harassment" is further defined as "any act of pursuit, torment, or annoyance which … has the potential to injure a marine mammal or marine mammal stock in the wild; or … any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered." 16 U.S.C. § 1362(18)(A).

[4] The term "salmonid" encompasses salmon and steelhead.

time, and method of such taking, criteria for evaluating the success of the action, and the duration of the intentional lethal taking authority." The Secretary then decides, based on this recommendation, whether to authorize the lethal removal. *See id.* § 1389(c).

## II.    Pinniped Predation at Bonneville Dam

The States of Oregon, Washington, and Idaho have applied for authorization under Section 120 to lethally remove CSL that prey on fish as they are migrating past Bonneville Dam on the Columbia River. Those fish include five salmonid populations that are listed as threatened or endangered under the ESA: the Upper Columbia River spring-run Chinook salmon, the Snake River spring/summer-run Chinook salmon, the Snake River Basin steelhead, the Middle Columbia River steelhead, and the Lower Columbia River steelhead. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1044 (9th Cir. 2010). In March 2008, the Agency authorized the States to lethally remove specific CSL from the Columbia River at the Bonneville Dam. *Id.*

That authorization was vacated by the Ninth Circuit in November 2010. *Id.* at 1059.[5] Particularly relevant here, the Ninth Circuit required the Agency to explain more fully two components of its authorization decision. First, the court directed the Agency to explain "the apparent inconsistencies" between its determination that the CSL were having a "significant negative impact" on the survival and recovery of salmonid stocks, on the one hand, and its factual findings in earlier environmental assessments in other administrative proceedings not

---

[5] Similar to the present case, plaintiffs had initially moved for a preliminary injunction. The district court denied the motion, and plaintiffs appealed the denial. The Ninth Circuit granted an emergency stay pending resolution of that interlocutory appeal. *See Humane Soc'y v. Gutierrez*, 527 F.3d 788 (9th Cir. 2008). The parties stipulated to the dismissal of the interlocutory appeal, however, before the Ninth Circuit had an opportunity to address the parties' arguments fully. *See* Joint Stipulation for Dismissal of Appeal, Case No. 08-35305, Doc. 23-2 (9th Cir. May 7, 2008).

involving sea lions that fishery harvest plans involving greater rates of mortality to salmonid

stocks would have only minimal adverse impacts on these same stocks, on the other hand. *See id.*

at 1048-52. Second, the court held inadequate the Agency's explanation for authorizing lethal

removal of CSL only as long as their predation rate exceeded one percent of the migrating

salmonids. *Id.* at 1052-54. In this one percent threshold, the court saw an implicit finding that

CSL predation at a rate greater than one percent would have a "significant negative impact," yet

the Agency had not explained why one percent would be the dividing line between significant

and non-significant impacts. *Id.* at 1052 & n.6.

The States submitted new applications in August 2011, and the Agency granted them new

letters of authority under Section 120 in March 2012.[6] Administrative Record ("AR") 1664

(Letter of Authority issued to the Oregon Department of Fish and Wildlife, Mar. 15, 2012);

AR1672 (Letter of Authority issued to the Washington Department of Fish and Wildlife,

Mar. 15, 2012); AR1680 (Letter of Authority issued to the Idaho Department of Fish and Game,

Mar. 15, 2012) . The letters authorize the States to lethally remove "wherever found (except for

breeding rookeries) individually identifiable predatory California sea lions" who meet certain

conditions.[7] AR1664-1665 (Oregon); AR1672-1673 (Washington); AR1680-1681 (Idaho).

---

[6] In the interim, the States had requested letters of authority in December 2010, and the
Agency had issued them in 2011 without repeating the full Section 120 process. AR1661-1662
(Decision Memorandum from S. Rauch III to W. Stelle, Jr., Mar. 13, 2002). After the Humane
Society challenged those authorizations in the summer of 2011, the Agency withdrew them and
the Humane Society then voluntarily dismissed its lawsuit. *Id.* The States' August 2011
applications followed.

[7] These conditions are that an individual CSL has been observed eating salmonids around
Bonneville Dam between January 1 and May 31 of any year; that it has been observed at
Bonneville Dam on at least five different days between January 1 and May 31 cumulatively
across years; and that it has been sighted at Bonneville Dam after it was "subjected to active non-
lethal deterrence." AR1664-1665 (Oregon); AR1672-1673 (Washington); AR1680-1681 (Idaho).

Under the authorization granted, no more than 92 California sea lions may be removed each year. AR1665; AR1673; AR1681. The States may either trap and euthanize the predatory CSL, or the CSL may be shot "by a qualified marksman shooting from land, the dam, or other shoreline structures" under certain conditions. AR1665-1666; AR1673-1674; AR1681-1682. The letters of authority are valid until June 30, 2016. AR1667; AR1675; AR1683.

Plaintiffs filed this action before the U.S. District Court for the District of Columbia and moved for a temporary restraining order ("TRO"); the States of Oregon and Washington intervened as defendants, opposed Plaintiffs' motion for a TRO, and moved to transfer the case to the District of Oregon. The federal district court in Washington, D.C. largely denied Plaintiffs' motion for a TRO, but limited the States' authority for lethal removal to no more than 30 California sea lions in 2012, which were not to be killed by shooting. Minute Order, *Humane Soc'y of the U.S. v. Bryson*, No. 1:12-cv-00427-JEB (D.D.C. Mar. 22, 2012). The parties then agreed to transfer the case to this court,[8] and Plaintiffs filed the pending motion for a preliminary injunction.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) that the plaintiff is likely to succeed on the merits; (2) that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff;

---

NOAA Fisheries, in consultation with the States, maintains a list of individual CSL that meet these criteria.

[8] The State of Idaho intervened as a defendant after the transfer of the case to this court.

and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not entirely displace the Ninth Circuit's "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies*, 632 F.3d at 1131. Under this approach, "a stronger showing of one element may offset a weaker showing of another." *Id.* Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips *sharply* in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 663 F.3d 1100, 1108 (9th Cir. 2011) (emphasis added); *see also Alliance for the Wild Rockies*, 632 F.3d at 1132.

On the merits, Plaintiffs have limited their arguments for the purposes of this motion to the Agency's compliance with the MMPA and the ESA. This court reviews an agency's compliance with both of these statutes under the judicial review procedures of the Federal Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq. Humane Soc'y of the U.S.*, 626 F.3d at 1047; *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Under the APA, agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Humane Soc'y of the U.S.*, 626 F.3d at 1047.

In addition, the APA directs that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Humane Soc'y of the U.S.*, 626 F.3d at 1048 (quoting *Motor*

*Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))

(internal quotation marks omitted). Thus, the role of the court is to

> look to the evidence the [agency] has provided to support its conclusions, along with other materials in the record, to ensure that the [agency] has not, for instance, 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Lands Council*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (last alteration in original).

## DISCUSSION

In support of their motion for a preliminary injunction, Plaintiffs make essentially two arguments.  First, Plaintiffs contend that the Agency authorized actions against California sea lions that will also result in the "incidental" taking of Steller sea lions ("SSL"), which is a species listed as threatened under the ESA. Plaintiffs argue that, under these circumstances, the ESA requires that the Agency make an additional finding regarding SSL. Because the Agency has only made findings with regard to CSL, Plaintiffs maintain, the Agency's 2012 authorization regarding CSL is invalid. Second, Plaintiffs assert that the Agency failed in its most recent Section 120 finding regarding CSL predation to comply with the two prior remand instructions that were directed by the Ninth Circuit in its 2010 decision.  This failure, according to Plaintiffs, is a sufficient and independent basis for the court to reject the Agency's 2012 authorization. Because these two arguments relate to different animals, different statutes, and different interests, they will be discussed separately.

OPINION AND ORDER, Page 8

## I.     Incidental Take of Steller Sea Lions

Plaintiffs argue that the Agency erred by failing to authorize incidental takes of SSL, which also prey on fish around Bonneville Dam. Under the ESA, if an otherwise lawful action will incidentally cause a "take" of a protected species,[9] such as the SSL, the Secretary must affirmatively find that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. §§ 1536(b)(4), 1538(a)(1)(B), 1539(a); *see also* 50 C.F.R. § 402.14(i) (requirement of an incidental take statement).[10]  Under the MMPA, the Secretary may allow "the incidental, but not intentional" take of marine mammals only after making a finding, following public notice and comment, that the taking "will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(A).

Plaintiffs argue that the lethal removal of CSL may incidentally "take" SSL, most likely by disrupting their foraging and resting behavior, but also by potentially causing accidental injury or even death to an individual SSL. The Agency does not dispute that the Secretary did not make findings under either § 1539 (ESA) or § 1371 (MMPA) authorizing the incidental take of SSL. Instead, the Agency argues that it was not required to do so.  The Agency bases this conclusion on express exceptions under both the ESA and the MMPA that permit the take of SSL incidental to "the nonlethal removal of nuisance animals." 50 C.F.R. § 223.203(b)(2)(i) (ESA); 16 U.S.C. § 1379(h)(1)(C) (MMPA).

At this preliminary stage of the litigation, the court will not resolve whether Plaintiffs are correct in their argument concerning the incidental take of Steller sea lions because the court

---

[9] Under the ESA, to "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."16 U.S.C. § 1532(19).

[10] 16 U.S.C. § 1538 applies to SSL pursuant to 50 C.F.R. § 223.202(a).

concludes that Plaintiffs have not established that they will suffer any irreparable harm with regard to *Steller* sea lions if any such procedural error is left uncorrected until this case is resolved on the merits. The purpose of a preliminary injunction is to prevent harm that would impair this court's ability to grant effective relief after resolving the merits of the case. *See* Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2948.1 (2012). To establish a need for a preliminary injunction, a plaintiff must show, among other things, that legal remedies would be inadequate (*i.e.,* that subsequent monetary damages would not compensate the plaintiff for any harm suffered). *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987). As a related matter, the harm alleged by the plaintiff must be imminent and not remote or speculative. *See Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

Plaintiffs have not established that harm to SSL is *likely* to occur, which is a requirement for the granting of a preliminary injunction. *Winter*, 555 U.S. at 22; *Alliance for the Wild Rockies*, 632 F.3d at 1131.[11] In support of their position on this issue with regard to SSL, Plaintiffs refer primarily to the Agency's 2009 Biological Opinion on authorizing lethal removal and funding non-lethal removal of sea lions ("2009 Sea Lion BiOp"). In that BiOp, the Agency noted that adverse effects to SSL resulting from lethal and non-lethal actions directed at CSL "would include disruption of foraging and resting behavior in the action area, *with the intended outcome* that Steller sea lions would abandon the area as a place to forage." AR0498 (2009 Sea

---

[11] The court accepts without deciding that Plaintiffs have established their own aesthetic and recreational interest in observing, photographing, and interacting with Steller sea lions. To establish a likelihood of irreparable injury to this interest, however, the Plaintiffs must demonstrate a likelihood that SSL will themselves be harmed to a degree that will affect Plaintiffs' ability to enjoy their presence in the Columbia River. That is, the SSL (and not merely the CSL) actually must be at risk of harm that exceeds temporary harassment or non-permanent injury.

Lion BiOp at 38). That is, the harassment would achieve the goal of displacing "nuisance" SSL, which is expressly allowed under 50 C.F.R. § 223.203(b)(2)(i) and 16 U.S.C. § 1379(h)(1)(C). And while the BiOp does acknowledge "a possibility that Steller sea lions may be physically injured by the deterrence activities," it also notes that "no injuries of Steller sea lions from deterrence activities have been observed since non-lethal deterrence activities began at the dam in 2005." *Id.* The BiOp concludes that "[n]o serious injuries or mortalities [to SSL] are anticipated" during the CSL removal program. The BiOp further concludes that "[d]irect effects on Steller sea lions are expected to be local and temporary," that "the proposed action is likely to affect only 10 to 20 Steller sea lion individuals per year," and that "[n]o measurable impact on the species' abundance or reproduction is expected." AR0502-0503 (2009 Sea Lion BiOp at 42-43).

The other sources identified by Plaintiffs likewise do not indicate that the lethal removals of CSL pose an imminent and serious threat to SSL, particularly in light of the lawful harassment to which SSL may already be subjected as a result of non-lethal deterrence actions.[12] Plaintiffs, therefore, have not identified an imminent harm that is of a magnitude that would warrant the

---

[12] The court notes one difference in the potential harassment of SSL as a result of lethal, compared to non-lethal, removal of CSL. The States are authorized to kill CSL through the use of firearms. *See, e.g.*, AR1673-1674 (Letter of Authority issued to the Washington Department of Fish and Wildlife, Mar.15, 2012, at 2-3). ESA regulations prohibit the discharge of firearms within 100 yards of an SSL. *See* 50 C.F.R. § 223.202(a)(1). As Plaintiffs point out, the letters of authority do not restrict the use of firearms in the vicinity of SSL. Discharging a firearm within 100 yards of a SSL would appear to violate the ESA, absent an incidental take statement. Plaintiffs have not demonstrated, however, that the discharge of firearms within 100 yards of an SSL is likely, given that all CSL lethally removed pursuant to the prior letters of authority were trapped and euthanized and that the States had found that "opportunities for use of firearms were extremely limited" due to sea lion haul-out patterns. AR1756, 1758 (2009); AR1788, 1793 (2010); AR5295 (2011). Plaintiffs have also not demonstrated that any resulting take would irreparably harm Plaintiffs' interests or the purposes of the ESA.

OPINION AND ORDER, Page 11

extraordinary relief of a preliminary injunction. "Federal courts are not obligated to grant an injunction for every violation of the law." *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 & n.4 (9th Cir. 1994) (affirming rejection of preliminary injunction in an ESA case where the movant did not establish the likelihood of future harm); *cf. Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 105-06 (D. Me. 2008) (refusing to grant a preliminary injunction barring the use of leghold traps where plaintiffs had demonstrated that the traps "take" ESA-protected lynx but had not demonstrated that these takes amounted to irreparable harm).

Because there is no showing of irreparable injury with regard to SSL, the court must deny Plaintiffs' request for a preliminary injunction to the extent that it is based on the unauthorized incidental take of Steller sea lions. *See Winter*, 555 U.S. at 22.

## II.    Section 120 Authority for the Lethal Removal of California Sea Lions

### A.   Likelihood of Irreparable Harm

Unlike the case with the SSL, Plaintiffs have established a likelihood that they will be irreparably harmed if the States are allowed to lethally remove CSL pursuant to the Section 120 letters of authority. The individually-named Plaintiffs have filed declarations with the court that describe their enjoyment of viewing the CSL in the Columbia River, their photography of and interactions with sea lions, and the relationships they have developed with specific CSL.

Plaintiff Bethanie O'Driscoll states that she sails or kayaks on the Columbia River near St. Helens, Oregon, at least once a week during the spring and summer, during which excursions she regularly interacts with sea lions. O'Driscoll Decl., Doc. 25, Ex. 19, at ¶¶ 4-5. She also travels to Astoria, Oregon, several times a month to visit the sea lions. *Id.* ¶ 6. Through these interactions, she has developed relationships with and attachments to individual CSL, whom she

describes as "friends or neighbors" or "family." *Id.* ¶¶ 7-14, 18; *see also id.* ¶ 19 ("I have developed a personal relationship with some of the animals, in the same way people develop a relationship with a family pet."). Ms. O'Driscoll is disturbed and upset by the idea that some of the CSL she has come to know may be killed pursuant to the Section 120 authorizations. *Id.* ¶¶ 17-19; *see also id.* ¶ 18 ("The whole proposal makes me feel like someone who has had their dog taken to the pound against their will.").

Plaintiff Andrea Kozil states that she regularly visits parks along the Columbia River, Sauvie Island in Oregon, and Astoria, Oregon; on these trips, she enjoys observing sea lions. Kozil Decl., Doc. 25, Ex. 20, at ¶¶ 8-10. She has repeatedly observed the same individual sea lions and "feel[s] a special connection to some" of them. *Id.* ¶¶ 11-14. The idea that they may be killed fills her with anxiety and sadness; allowing the Section 120 lethal removals to proceed "will greatly impact [her] ability to peacefully observe and enjoy these creatures and therefore will harm [her] recreational, personal, and aesthetic interests." *Id.* ¶¶ 18-19, 21-22.[13]

Because Plaintiffs value individual CSL, including some identified by the Agency and the States for lethal removal, these declarations are sufficient to establish an imminent harm that is likely to occur should the States be allowed to exercise their authority under Section 120. Moreover, that harm is irreparable. The particular CSL with which these plaintiffs have developed an affinity are not fungible with other CSL. The individual Plaintiffs will suffer a real emotional and aesthetic injury from the knowledge that CSL have been killed as a result of the authorizations, and this injury is not compensable with monetary damages. *See Humane Soc'y v. Gutierrez*, 527 F.3d 788, 790 (9th Cir. 2008) (noting in a prior iteration of this case that "the

---

[13] A declaration from Bernadette Price, a member of Plaintiff Humane Society, is to similar effect, albeit with some differences.

lethal taking of the California sea lions is, by definition, irreparable"); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding irreparable harm where plaintiffs lived near and enjoyed the bison in national parks, and "seeing or even contemplating the type of treatment of the bison inherent in an organized hunt would cause them to suffer an aesthetic injury that is not compensable in money damages"); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (finding irreparable harm where each plaintiff "enjoys the neighboring Yellowstone bison in much the same way as a pet owner enjoys a pet, so that the sight, or even the contemplation, of treatment in the manner contemplated of the wild bison, which they enjoy and have seen and are likely to see capture for the program would inflict aesthetic injury"); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220-21 (D.D.C. 2003) (collecting cases holding that the killing of animals causes irreparable harm to those with a special interest in the animals); *see also Amoco*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").

In response, Defendants urge the court to evaluate Plaintiffs' alleged irreparable harm in light of the statute's purpose. They argue that the MMPA's purpose is to protect marine mammal species, not individual animals. For purposes of evaluating the pending motion for preliminary injunction, the court does not agree. The MMPA prohibits the taking of any individual marine mammal even if its species is not in jeopardy. Defendants are correct, however, that the MMPA includes a number of exceptions indicating that other legislative policy priorities may supersede the protection of individual marine mammals, but the exceptions prove the rule. No one in this litigation disputes that the CSL population is robust and neither endangered nor threatened and that the authorized lethal removals will not harm the viability of the species as a whole.

OPINION AND ORDER, Page 14

Nevertheless, Section 120 still requires a detailed and specific  procedure before the Secretary may authorize the lethal taking of any individual CSL.

For this reason, the ESA cases relied upon by Defendants are not applicable to this portion of the analysis.[14] Unlike the statutory purpose of the MMPA, the ESA aims to protect the viability of endangered or threatened species. The loss of an individual animal that does not jeopardize the species as a whole may not offend the purpose of the ESA (a question that this court has no need to resolve at this time), but it may well offend the purpose of the MMPA. *Cf. Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257-58 (10th Cir. 2003) (district court erred when it required plaintiffs to demonstrate harm to species as a whole; because plaintiffs had not brought an ESA case, there was "no compelling reason why the ESA language should serve as a benchmark for deciding whether plaintiffs have shown irreparable harm"). Further, unlike the ESA cases cited by Defendants, Plaintiffs have established a harm related to the loss of individual animals, not simply a general interest in the survival of the species.

The court therefore accepts Plaintiffs' showing of irreparable injury should the States continue to lethally remove CSL.

### B.  Likelihood of Success on the Merits

Before a preliminary injunction may be issued, Plaintiffs must also establish a likelihood of success on the merits. In the Ninth Circuit, they can satisfy this requirement provided they at least "demonstrate a fair chance of success on the merits, or questions serious enough to require

---

[14] *See, e.g.*, *Burlington N. R.R.*, 23 F.3d at 1512 n.8 (noting in an ESA case that "a definitive threat of future harm to protected species, not mere speculation," is required in order to establish the likelihood of irreparable harm); *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209-10 (D. Mont. 2009) (because the purpose of the ESA is to prevent endangerment and extinction of animals, "the measure of irreparable harm is taken in relation to the health of the overall species rather than individual members").

litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)) (internal quotation mark omitted). Plaintiffs present two independent arguments regarding the Agency's Section 120 finding, both derived from the Ninth Circuit's prior instructions on remand. The court concludes that these arguments at least raise serious questions going to the merits. That showing is sufficient to warrant a preliminary injunction under the Ninth Circuit's "sliding scale" approach *if* the remaining factors tip *sharply* in Plaintiffs' favor. *See Alliance for the Wild Rockies*, 632 F.3d at 1132.

First, Plaintiffs argue that the Agency has not adequately explained the apparent inconsistencies between its Section 120 finding and its prior findings in other administrative proceedings regarding fisheries and harvest management for the Columbia River. As the Ninth Circuit noted, the Agency concluded in four environmental assessments between 2003 and 2007 that fishery takes that were comparable to or greater than takes by CSL would *not* have significant adverse effects on the survival or recovery of protected salmonid stocks. *Locke*, 626 F.3d at 1048.  For example, the Agency's January 2007 assessment of a fisheries plan for the Middle Columbia River "found that the plan, which would result in the taking of up to '*10 percent* of the annual abundance of natural-origin adult and juvenile steelhead' (emphasis added) would not appreciably reduce the likelihood of survival and recovery of salmon and steelhead listed under the ESA." *Id.* at 1048-49. Likewise, the Agency's April 2005 assessment found that a fisheries plan allowing takes of between 5.5 and 17 percent of listed Columbia River salmonids each year would have minimal adverse effects on protected salmonids, and that the cumulative impacts of this fisheries plan "would be minor *if at all measureable*." *Id.* at 1048 (internal quotation mark omitted) (emphasis in original).

OPINION AND ORDER, Page 16

The Agency, however, did provide an explanation for these seeming inconsistencies. Among other things, the Agency explained how it understands the "significant negative impact" standard in Section 120 to differ from the "significantly affecting" standard set forth in the National Environmental Policy Act ("NEPA") under which the Agency had made its prior environmental assessment findings. The Agency explained that one distinction is its ability to control fisheries and harvest takes, *e.g.*, by restricting takes if stocks decrease or by requiring the release of naturally spawning salmonids (versus hatchery fish, which are readily distinguished by their clipped adipose fins). The Agency also noted that it had typically found that fisheries *would* negatively impact salmonid survival and recovery, even if they would not necessarily jeopardize species survival. *See* AR1638-1650 (NMFS, Report on Consideration of Statutory Factors under Section 120 of the MMPA, Mar. 2, 2012 ("Section 120 Report"), at 22-34).

Second, Plaintiffs argue that the Agency has not adequately explained its decision to eliminate the one percent threshold altogether, thereby authorizing the States to lethally remove CSL even if the pinniped predation rate falls below one percent.[15] The Agency explained that it deleted the one percent threshold because it shifted from a quantitative standard to a qualitative approach in assessing pinniped predation under Section 120. AR1650-1652 (Section 120 Report at 34-36).

In both instances, Plaintiffs raise serious questions regarding the adequacy of the Agency's explanations. Given the complexity of the issues and the facial plausibility of the Defendants' explanations, however, the court cannot conclude that Plaintiffs have established a

---

[15] Under the 2008 letters of authorization, the Agency planned to assess after three years of lethal removals whether the sea lions were consuming on average less than one percent of the salmonids migrating past the dam. If so, the lethal removal program would be suspended. *See, e.g.*, AR1586 (D. Darm, NEPA review memorandum, Mar. 2, 2012, at 7).

OPINION AND ORDER, Page 17

clear likelihood of success on the merits on either argument. The scope of review under the APA's arbitrary and capricious standard is narrow, and the court must take particular care not to overstep its role when reviewing the agency's selection of methodology or a decision involving a high level of technical expertise. *Lands Council*, 537 F.3d at 992-93. This is not to suggest that a plaintiff cannot demonstrate a likelihood of success on the merits when an agency's conduct is challenged. In this particular case, however, it is a combination of the complexity of the issues, the Agency's facially plausible explanations, and the deferential scope of review that create uncertainty about the ultimate resolution of this argument at this preliminary stage of the proceedings. Accordingly, under the Ninth Circuit's sliding scale approach, Plaintiffs have established only that "serious questions" are present. It thus becomes necessary to determine whether the balance of equities tips sharply in favor of Plaintiffs. For the following reasons, the court concludes that it does not.

### C.  Balance of Equities and the Public Interest

Where a plaintiff establishes a likelihood of irreparable harm but only serious questions going to the merits, as Plaintiffs have done here, the balance of the equities must tip *sharply* toward the plaintiff in order for a preliminary injunction to be appropriate. *Alliance for the Wild Rockies*, 632 F.3d at 1132. Here, in fact, the balance of the equities appears to tip toward Defendants, rather than tipping sharply toward Plaintiffs. Further, the court concludes that the public interest may be more harmed by the issuance of a preliminary injunction than by its denial.

In considering whether to grant a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief." *Amoco Prod.*, 480 U.S. at 542; *see also Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999) ("To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it."). The hardship on Plaintiffs is real and significant, and the court acknowledges the irreparable harm that Plaintiffs will suffer by the loss of an individual CSL. Issuing the requested preliminary injunction, however, would harm Defendants' ability to protect endangered and threatened salmonid stocks and aid in their recovery. After the Supreme Court decided *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), courts have routinely held that the balance of equities tips sharply in favor of protecting threatened or endangered species. *E.g.*, *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species."); *Nat'l Wildlife Fed'n* , 23 F.3d at 1511 ("The 'language, history, and structure' of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." (quoting *Tenn. Valley Auth.*, 437 U.S. at 174)).

Further, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). The harm identified by Plaintiffs is primarily a personal harm: their own aesthetic and recreational interest. The court presumes that other members of the public share

this interest in observing sea lions in the Columbia River, but the public interest in ensuring the survival of salmonid stocks, as expressed through the ESA, weighs more heavily. *See Nat'l Wildlife Fed'n*, 23 F.3d at 1511. Indeed, this is the balance struck by Congress itself in enacting Section 120, which acknowledges that at-risk salmonid stocks should take precedence over the protection of individual pinnipeds (provided that those pinnipeds are not themselves threatened or endangered).[16] *Cf. Amoco Prod.*, 480 U.S. at 545-46 (analyzing public interest prong in light of two competing statutes).

Given the ESA interests that weigh against Plaintiffs' motion, the court cannot find that the balance of the equities tips sharply in Plaintiffs' favor or that the issuance of a preliminary injunction would further the public interest more than it might harm it. Under *Winter*, therefore, the court denies Plaintiffs' motion for a preliminary injunction.

## CONCLUSION

For the reasons stated above, the Plaintiffs' Motion for a Preliminary Injunction (Doc. 24) is DENIED.

DATED this 30th day of May, 2012.


/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[16] The court does not suggest that Section 120 was or was not properly invoked in this instance, a question reserved for later consideration on the merits; rather, the court merely infers from Section 120 a congressional policy that prioritizes ESA concerns over MMPA protection of individual pinnipeds.

OPINION AND ORDER, Page 20