UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **HUMANE SOCIETY OF THE UNITED STATES, WILD FISH CONSERVANCY, BETHANIE O'DRISCOLL,** and **ANDREA KOZIL,** )<br>)<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>**JOHN BRYSON,** Secretary of Commerce, )<br>**SAMUEL RAUCH**, Asst. Administrator, )<br>NOAA Fisheries, and **JAMES LECKY**, )<br>Director, Office of Protected Resources, )<br>)<br>Defendants, )<br>)<br>v. )<br>)<br>**STATE OF WASHINGTON, STATE OF OREGON,** and **STATE OF IDAHO,** )<br>)<br>Intervenor-Defendants. ) | Case No. 3:**12-cv-642-SI**<br><br><br><br>**OPINION AND ORDER** |

**SIMON, District Judge.**

Like walruses and seals, sea lions are "pinnipeds," or aquatic carnivorous mammals with

fins for limbs.  Sea lions eat salmonids, a family of anadromous fish that includes salmon and

steelhead.[1]  In recent years, a greater number of sea lions have travelled up the Columbia River, which runs between Oregon and Washington, to the Bonneville Dam.  Because Bonneville Dam obstructs the progress of salmonids returning from the sea to spawn, the salmonids congregate in the area directly below the dam (the dam's "tailrace") before working their way up the dam's fish ladders.  This bottleneck makes the salmonids easy prey for sea lions at Bonneville Dam.

The National Marine Fisheries Service ("NMFS," a federal agency) and the states of Oregon, Washington, and Idaho (collectively, the "States") are concerned about sea lion predation at Bonneville Dam because the sea lions are eating salmonids that are protected as threatened or endangered under the Endangered Species Act ("ESA").  The sea lions are also protected, however, under the Marine Mammals Protection Act ("MMPA"), and one species of sea lions present at the dam (the Steller sea lion) is further protected as a threatened species under the ESA.  This case is about how Congress, NMFS, and the States have tried to balance the protection of sea lions with the protection of threatened and endangered salmon and steelhead.

Plaintiffs in this case—the Humane Society of the United States, Wild Fish Conservancy, Bethanie O'Driscoll, and Andrea Kozil (collectively, "Plaintiffs" or "Humane Society")—disagree with how NMFS has struck this balance.  Plaintiffs have sued NMFS[2] over its decision to authorize Oregon, Washington, and Idaho to lethally remove (*i.e.*, kill) particular California sea lions (which is a different species from Steller sea lions) when efforts to deter them from

---

[1] "Anadromous fish are those which spend most of their life in the open sea, but which return as adults to freshwater streams … to spawn."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 367 n.7 (1989) (quoting *Puyallup Tribe, Inc. v. Wash. Game Dep't*, 433 U.S. 165, 168 (1977)) (internal quotation marks omitted).

[2] More precisely, Plaintiffs sued the Secretary of Commerce and two administrators of NMFS, but the Court will refer to the defendants simply as "NMFS" throughout.

OPINION AND ORDER, Page 2

feeding on salmonids at Bonneville Dam have failed.  Oregon, Washington, and Idaho have intervened as defendants, arguing that NMFS acted correctly in authorizing the lethal removals.[3]

All parties have moved for summary judgment.  After considering all the parties' arguments and reviewing the administrative record, the Court concludes that NMFS did not act arbitrarily or capriciously when it issued the lethal removal authorizations to the States.  The Court also concludes that the authorizations do not conflict with the MMPA's protection of Steller sea lions and that NMFS complied with the National Environmental Policy Act ("NEPA") when it issued a supplemental information report in lieu of supplementing its environmental assessment.  The Court therefore DENIES Plaintiffs' Motion for Summary Judgment (Doc. No. 75), GRANTS NMFS's Cross-Motion for Summary Judgment (Doc. No. 77), and GRANTS the States' Cross-Motion for Summary Judgment (Doc. No. 79).  As a result, this case is dismissed.

## BACKGROUND

## I.    Section 120 of the Marine Mammals Protection Act

Sea lions are protected under the MMPA from unauthorized "take."  To "take" a marine mammal means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill." 16 U.S.C. § 1362(13).  "Harassment" is further defined as

> any act of pursuit, torment, or annoyance which … has the potential to injure a marine mammal or marine mammal stock in the wild; or … has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

*Id.* § 1362(18)(A).

---

[3] At times, the Court will refer to NMFS and the States collectively as "Defendants."

Section 120 of the MMPA, however, creates an exception to the MMPA's take prohibition. Section 120 allows a state to apply to the Secretary of Commerce ("Secretary") "to authorize the intentional lethal taking of individually identifiable pinnipeds which are having a significant negative impact on the decline or recovery of [certain] salmonid fishery stocks." *Id.* § 1389(b)(1). The salmonids at issue must be listed as threatened or endangered under the ESA, or the Secretary must find that they are approaching that status. *Id.* § 1389(b)(1).[4] Section 120 cannot be invoked if the predatory pinnipeds are themselves listed as threatened or endangered under the ESA, or are "depleted" or constitute "strategic stock" as those terms are defined by the MMPA. *Id.* § 1389(e).

After a preliminary assessment of a state's Section 120 application, the Secretary convenes the Pinniped-Fishery Interaction Task Force ("Task Force"). *Id.* § 1389(c). The Task Force consists of Department of Commerce employees, scientists, representatives of affected conservation and fishing community organizations, treaty tribes, state officials, and potentially others. Following a public comment period, the Task Force issues a recommendation that includes "[1] a description of the specific pinniped individual or individuals, [2] the proposed location, time, and method of such taking, [3] criteria for evaluating the success of the action, and [4] the duration of the intentional lethal taking authority." *Id.* The Secretary then decides, based on this recommendation, whether to authorize the lethal removal. *See id.*

In reaching their respective decisions, the Task Force and the Secretary are to consider the following four factors: (1) "population trends, feeding habits, the location of the pinniped interaction [with the salmonids], how and when the interaction occurs, and how many individual

---

[4] Section 120 also applies to salmonids migrating through the Ballard Locks of Seattle, Washington, regardless of their ESA status, but that exception is not relevant to this case.

pinnipeds are involved"; (2) "past efforts to nonlethally deter such pinnipeds, and whether the applicant has demonstrated that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal steps without success"; (3) "the extent to which such pinnipeds are causing undue injury or impact to, or imbalance with, other species in the ecosystem, including fish populations"; and (4) "the extent to which such pinnipeds are exhibiting behavior that presents an ongoing threat to public safety." *Id.* § 1389(d).

## II.    Pinniped Predation at Bonneville Dam

In 2006, the states of Oregon, Washington, and Idaho applied for authorization under Section 120 to lethally remove California sea lions ("CSL") that were preying on fish as they migrated past Bonneville Dam on the Columbia River. Those fish include five salmonid populations that are listed as threatened or endangered under the ESA: the Upper Columbia River spring-run Chinook salmon, the Snake River spring/summer-run Chinook salmon, the Snake River Basin steelhead, the Middle Columbia River steelhead, and the Lower Columbia River steelhead. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1044 (9th Cir. 2010). In March 2008, NMFS authorized the States under Section 120 to lethally remove specific CSL that were preying on protected salmonids at Bonneville Dam. *Id.* That authorization was vacated by the Ninth Circuit in November 2010. *Id.* at 1059. Of particular relevance to the present dispute, the Ninth Circuit required NMFS to explain more fully two components of its authorization decision.

First, the Ninth Circuit directed NMFS to explain the apparent inconsistencies between its Section 120 finding that sea lion predation was having a significant negative impact on protected fish, on the one hand, and its prior positive environmental assessments of fishery plans

that seemed to have greater mortality impacts on the same fish, on the other hand.  *Id.* at 1049.

The Ninth Circuit explained that the prior factual findings in these environmental assessments

did not necessarily conflict with NMFS's Section 120 finding, but it required NMFS at least to

explain how the findings were reconcilable.  *Id.* at 1050-51 & n.4.

Second, the Section 120 authorization was set to expire automatically if the CSL ate, on

average over a period of three years, less than one percent of migrating salmonids.  In this one-

percent threshold, the Ninth Circuit saw an implicit finding that only CSL predation greater than

one percent would have the requisite "significant negative impact on the decline or recovery" of

protected fish.  *See id.* at 1052 & n.6.  The Ninth Circuit directed NMFS "either to articulate a

reasoned explanation for its action or to adopt a different action with a reasoned explanation that

supports it."  *Id.* at 1053.

### III.    The 2012 Letters of Authorization

Following the Ninth Circuit's ruling, the States resubmitted their Section 120 applications

in December 2010, and NMFS issued letters of authorization in 2011 without repeating the full

Section 120 process. After Plaintiffs challenged those authorizations in the summer of 2011,

NMFS withdrew them, and Plaintiffs voluntarily dismissed their lawsuit.[5]  The States then re-

applied for authorization in August 2011.  Following a full review by the Task Force, NMFS

granted all three states new letters of authorization under Section 120 in March 2012.[6]

---

[5] *See* Decision Memorandum to S. Rauch III from W. Stelle, Jr. (Mar. 13, 2012), Administrative Record ("AR") Doc. 2012-239, at 1-2 (hereafter "Decision Memo.").  The Court will refer to the administrative record by document number and, whenever possible, by the internal pagination of the document.

[6] Letter of Authority issued to the Oregon Department of Fish and Wildlife (Mar. 15, 2012), AR Doc. 2012-240 (hereafter "Oregon LOA"); Letter of Authority issued to the

The letters authorize the States to lethally remove "wherever found (except for breeding rookeries) individually identifiable predatory California sea lions" that meet a list of conditions.[7] No more than 92 CSL may be removed each year. The States may trap and euthanize the individually identified CSL or transfer them to permanent captivity, or the CSL may be shot "by a qualified marksman shooting from land, the dam, or other shoreline structures" under certain conditions.  The letters of authority are valid until June 30, 2016.

Plaintiffs initially filed this action before the U.S. District Court for the District of Columbia.  They argued that NMFS's Section 120 determination did not comply with the Ninth Circuit's instructions on remand and was arbitrary or capricious in violation of the Administrative Procedure Act ("APA"); that the letters of authorization allow "takes" of Steller sea lions, a threatened species, in violation of the ESA and the MMPA; and that NMFS violated NEPA by not preparing a supplemental environmental assessment before issuing the new authorizations.  After the case was transferred to this Court, the Court denied Plaintiffs' motion for preliminary injunction.  *See Humane Soc'y of the U.S. v. Bryson*, No. 3:12-cv-642-SI, 2012 WL 1952329 (D. Or. May 30, 2012).

All parties have now moved and cross-moved for summary judgment.  Because the Court is reviewing a final agency determination under the APA, its review is limited to the administrative record; no further fact-finding is required.  Summary judgment is therefore an

---

Washington Department of Fish and Wildlife (Mar. 15, 2012), AR Doc. 2012-241; Letter of Authority issued to the Idaho Department of Fish and Game (Mar. 15, 2012), AR Doc. 2012-242.

[7] These conditions are that an individual CSL has been observed eating salmonids around Bonneville Dam between January 1 and May 31 of any year; that it has been observed at Bonneville Dam on at least five different days between January 1 and May 31 cumulatively across years; and that it has been sighted at Bonneville Dam after it was "subjected to active non-lethal deterrence."  *E.g.*, Oregon LOA, AR Doc. 2012-240, at 2. NMFS, in consultation with the States, maintains a list of individual CSL that meet these criteria.

appropriate vehicle for resolving the case in full.  *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## LEGAL STANDARDS

The Court reviews NMFS's compliance with the MMPA, ESA, and NEPA under the APA, which allows the Court to set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 901-02 (9th Cir. 2012).  This scope of review is "narrow," and "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court's role is to ensure that NMFS examined the relevant data and articulated a satisfactory explanation for its decision.  *See id.*  An agency's decision would be arbitrary or capricious, for example, if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

The Court reviews NMFS's interpretation of the MMPA, a statute it is charged with administrating, under the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  First, the Court determines whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is

based on a permissible construction of the statute." *Id.* at 843.  At this second step, "[i]f a statute

is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a

federal court to accept the agency's construction of the statute, even if the agency's reading

differs from what the court believes is the best statutory interpretation." *Nat'l Cable &*

*Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

## DISCUSSION

## I.      Challenge to Section 120 Findings under the Marine Mammals Protection Act

Plaintiffs' primary claim is that the lethal removal authorizations do not comply with

Section 120 of the MMPA.  Plaintiffs contend that NMFS did not satisfy the Ninth Circuit's

instructions on remand from *Humane Society of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010);

that NMFS's interpretation of the Section 120 standard is unreasonable and does not warrant

*Chevron* deference; and that NMFS's application of Section 120 was arbitrary or capricious in

violation of the APA.  Based primarily on NMFS's "Report on Consideration of Statutory

Factors under Section 120 of the MMPA" ("Section 120 Report," AR Doc. 2012-235), the Court

concludes that NMFS did comply with the Ninth Circuit's remand instructions.  The Court also

holds that *Chevron* deference applies to NMFS's interpretation of the Section 120 standard and

that NMFS's application of that standard was not arbitrary or capricious.

### A.      Compliance with the Ninth Circuit's Directions on Remand

In *Locke*, the Ninth Circuit directed NMFS to explain (i) the apparent inconsistencies

between NMFS's findings under Section 120 and its prior findings regarding salmon mortality in

other environmental documents and (ii) NMFS's choice of a one-percent predation threshold for

revoking the lethal removal authorizations.

1.      Reconciling Prior Environmental Assessments

In prior decision documents, NMFS concluded that takes by fisheries of up to 17 percent of protected salmonid runs would not reduce appreciably the salmonids' likelihood of survival and recovery.  Plaintiffs argue that these conclusions conflict with NMFS's finding that sea lion predation of up to 4.2 percent of protected fish at Bonneville Dam has a "significant negative impact on the survival and recovery" of the same species.  In arguing that NMFS's Section 120 findings are inconsistent with the agency's prior determinations, Plaintiffs rely on four environmental assessments ("EAs") previously authored by NMFS.

One of these EAs, the 2007 *Final EA for Pacific Coast Salmon Plan Amendment 15* (AR Doc. 2012-345), does not appear to be relevant to the present dispute because it does not discuss impacts on salmonids present at Bonneville Dam.  Plaintiffs also continue to cite biological opinions and biological assessments prepared for the Federal Columbia River Power System, which includes Bonneville and other hydroelectric dams on the river.  As the Ninth Circuit has already pointed out, the August 2007 biological assessment of the hydropower system was compiled by the U.S. Army Corps of Engineers, the Bureau of Reclamation, and the Bonneville Power Administration—not NMFS.  *See Locke*, 626 F.3d at 1051 n.5.  NMFS does prepare biological opinions as part of the ESA-mandated consultation process regarding the hydropower system's impact on salmonids, but those biological opinions have consistently concluded that the hydropower dams, if left unmitigated, *do* jeopardize the survival and recovery of protected salmon and steelhead.  NMFS has only found that the operation of the dams in accordance with a series of mitigation measures—the "Reasonable and Prudent Alternative," in ESA-speak—"is not likely to jeopardize the continued existence" of listed salmonid species.  Supplemental

OPINION AND ORDER, Page 10

Consultation on Remand for Operation of the FCRPS, AR Doc. 2012-353, Sec. 4, at 9.[8]  NMFS identified these distinctions in its Section 120 Report and explained why its findings regarding salmonid mortality caused by the hydropower dams do not conflict with its Section 120 findings regarding pinniped predation, and the Court finds this explanation to be reasonable.  *See* Section 120 Report, AR Doc. 2012-235, at 32-34.

This leaves for evaluation three EAs regarding fisheries in the Pacific Northwest.  With regard to these EAs, the Court concludes that NMFS has reasonably explained any apparent inconsistencies among its findings for two reasons: first, NMFS identified substantive differences among the applicable statutory standards, and second, NMFS identified relevant qualitative differences between the impacts caused by fisheries and the mortality caused by pinniped predation.  To provide context for these explanations, the Court begins by describing the different statutory provisions at issue and the content of the three fisheries EAs.

(a)      <em>Comparison of Statutory Provisions</em>

The MMPA, the ESA, and NEPA use similar but not identical terminology to set forth related yet distinct concepts.  Under the MMPA, NMFS can override the statute's protection for pinnipeds if it finds that the pinnipeds "are having a *significant negative impact on the decline or recovery*" of protected salmonids. 16 U.S.C. § 1389(b)(1) (emphasis added).  The statute does not define, however, the phrase "significant negative impact."  Although Plaintiffs challenge its interpretation, NMFS defines "significant negative impact" to mean an impact that is

---

[8] Plaintiffs imply that the Reasonable and Prudent Alternative for the hydropower system still allows for a 17 percent mortality rate among protected species.  *See* Plfs.' Combined Mem. in Opp'n at 6.  But Plaintiffs have not identified where in the administrative record this 17 percent figure can be found, and the Court has been unable to locate it.

"'meaningful' and not 'insignificant' or 'meaningless.'" 76 Fed. Reg. 56,167, 56,170 (Sept. 12, 2011).[9]

Under the ESA, federal agencies must ensure that any action they authorize, fund, or implement "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). In fulfilling this responsibility, the agency's first step is to determine if a contemplated action "will likely affect" any listed species. If the action "*is not likely to adversely affect* any listed species or critical habitat," further evaluation is typically not required. 50 C.F.R. § 402.14(b) (emphasis added). NMFS considers that "an action is not likely to adversely affect a species if the effects are 'insignificant, discountable, or entirely beneficial.'" Section 120 Report, AR Doc. 2012-235, at 23 (quoting NMFS's ESA Section 7 Consultation Handbook). "Insignificant" in turn means that a person could not "meaningfully measure, detect or evaluate" the effects. *Id.* (quoting Handbook).

If, however, it appears that the action "*will* likely affect" any endangered or threatened species or critical habitat, meaning that its impact is measurable or detectable, the ESA's formal consultation process is triggered. 16 U.S.C. § 1536(a)(3) (emphasis added). As part of that process, a biological opinion (commonly referred to as a "BiOp") must be prepared by the relevant expert agency, which for salmonids is NMFS. The BiOp studies more closely whether the contemplated action will jeopardize a protected species, and if so, whether "reasonable and prudent alternatives" will mitigate that harm. *Id.* § 1536(b)(3)(A). To "jeopardize the continued existence of" a listed species means "to engage in an action that reasonably would be expected, directly or indirectly, *to reduce appreciably the likelihood of both the survival and recovery* of a

---

[9] This Federal Register notice is reproduced in the administrative record at AR Doc. 2012-123.

OPINION AND ORDER, Page 12

listed species in the wild by reducing the reproduction, numbers, or distribution of that species."
50 C.F.R. § 402.02 (emphasis added). If the consulting agency (here, NMFS) determines that
the proposed action or the reasonable and prudent alternatives will not jeopardize a protected
species, it issues an incidental take statement ("ITS"), which permits the agency to move forward
even if the action will result in some unintentional harm to listed species. *See* 16 U.S.C.
§ 1536(b)(4); 50 C.F.R. § 402.14(i).

Unlike the MMPA and the ESA, NEPA is a purely procedural statute: it does not
"mandate particular results" for agency decisionmaking, but "simply prescribes the necessary
process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's
primary requirement is that, before any "major Federal action[] *significantly affecting the quality
of the human environment*," the responsible official must prepare an environmental impact
statement ( "EIS"). 42 U.S.C. § 4332(C) (emphasis added). To determine whether an action will
"significantly affect[] the quality of the human environment," the agency first prepares an
environmental assessment ("EA"). 40 C.F.R. § 1501.4. If the EA demonstrates that the action
"*will not have a significant effect on the human environment*," the agency issues a finding of no
significant impact ("FONSI") and does not have to prepare a full environmental impact
statement. *Id.* § 1508.13 (emphasis added). Otherwise, if the action *will* have a significant effect
on the human environment, an environmental impact statement is required.

The term "significantly" is defined in NEPA's implementing regulations. *See* 40 C.F.R.
§ 1508.27. "Significantly as used in NEPA requires consideration of both context and intensity."
*Id.* Consideration of context includes social and geographical context as well as short- and long-
term effects. *Id.* § 1508.27(a). As for "intensity," the regulation directs the agency to consider

ten factors, including among others public health and safety, uncertainty or unknown risks, and impacts on historically or culturally significant resources. *Id.* § 1508.27(b). Also among these factors is "*[t]he degree to which the action may adversely affect* an endangered or threatened species." *Id.* § 1508.27(b)(9) (emphasis added). That is, ESA-type considerations are only one of many factors to be weighed in an agency's determination under NEPA whether an action will significantly affect the human environment, which in turn merely requires the agency to prepare a more thorough environmental analysis before undertaking the proposed action.

### (b)   The Fisheries EAs

Two of the EAs relied upon by Plaintiffs relate to recreational fishing in tributaries of the Columbia River: the 2003 *EA of NOAA Fisheries' Approval of Five Fisheries Management and Evaluation Plans* ("2003 EA," AR Doc. 2012-340), and the 2007 *EA of NMFS's Approval of Five Fisheries Management and Evaluation Plans for Tributaries of the Middle Columbia River* ("2007 EA," AR Doc. 2012-344). When salmonid populations are listed as threatened under the ESA, NMFS promulgates rules for their protection, including exceptions for when "take" of the threatened fish may be allowed.[10] One such exception allows NMFS to approve "Fishery Management and Evaluation Plans" (often abbreviated "FMEP" but here referred to as "Fishery Plans") developed by the States. *See* Section 120 Report, AR Doc. 2012-235, at 24 & n.5. NMFS may approve a Fishery Plan only if it determines that the fisheries "would not appreciably reduce the likelihood of survival and recovery of listed salmon and steelhead" (that is, if they will not jeopardize listed species). 2003 EA, AR Doc. 2012-340, at 2.

---

[10] The ESA uses a definition of "take" that is similar but not identical to the definition in the MMPA. *See* 16 U.S.C. § 1532(19) (defining "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct").

NMFS's approval of a Fishery Plan constitutes a major federal action that triggers NEPA's study requirements.  To comply with NEPA, NMFS must then prepare an EA that considers whether the Fishery Plan would "significantly affect[] the human environment"; if so, a full environmental impact statement must be prepared.  In both of the 2003 and 2007 EAs, NMFS found that the Fishery Plans for recreational fishing would not significantly affect the human environment and therefore did not prepare a full environmental impact statement.

Under the approved Fishery Plans, the recreational fisheries would be "mark selective," meaning that they could target only hatchery fish, which are distinguishable by their clipped adipose fins.  Any naturally spawned fish caught by accident would be released.  The "takes" identified in the Fishery Plans are therefore estimates of incidental deaths of protected wild fish caused by handling pursuant to this catch-and-release policy.  In the 2007 EA, for example, NMFS anticipated that such incidental mortality would not exceed 10 percent of wild steelhead and would likely be "well below" that rate.  2007 EA, AR Doc. 2012-344, at 39-40.  To protect particularly sensitive populations of fish, the approved Fishery Plans would close some tributaries to recreational fishing during certain seasons.  *See* 2003 EA, AR Doc. 2012-340, at 4-5; 2007 EA, AR Doc. 2012-344, at 8-13.  To limit incidental takes of juvenile steelhead in particular, the Fishery Plans imposed restrictions on the type of baits and flies that could be used. 2003 EA, AR Doc. 2012-340, at 28; 2007 EA, AR Doc. 2012-344, at 8.

Thus, for example, NMFS concluded in the 2003 EA that its approval of the Fishery Plans *will* "adversely affect[]" listed salmon and steelhead in the Lower Columbia River but "will not appreciably reduce the likelihood of survival and recovery" of those fish.  2003 EA, AR Doc. 2012-340, at 40.  Considering this finding along with the other factors it must consider

under NEPA's definition of "significantly," NMFS concluded that the Fishery Plans would not significantly affect the human environment and issued a FONSI, which meant that NMFS did not have to prepare a full environmental impact statement. *Id.* at 40-41.

Plaintiffs have emphasized the 2005 *EA Prepared by NMFS on Biological Opinion and Associated ITS on Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in the Years 2005-2007* ("2005 EA," AR Doc. 2012-342).  This EA, related to ongoing litigation in *United States v. Oregon*, No. 3:68-cv-513-KI (D. Or.), considered commercial, sport, and tribal fisheries in both the mainstem and the tributaries of the Columbia River.  NMFS's approval of these fisheries and its issuance of an ITS, which allows the fisheries to operate despite incidental takes of protected fish, constituted a major federal action that triggered NEPA responsibilities, including the preparation of the 2005 EA.  The 2005 EA considered both Treaty Indian fishing, which refers to the fishing rights of Indian tribes that are reserved in treaties between the tribes and the federal government, and non-Indian fishing, which encompasses both commercial and sport fishing.  For example, depending on the salmonid species and the size of the run, non-Indian fisheries' impact on the salmonid populations relevant to this case is limited to 1.0 to 7.9 percent of the runs, while the impact on these same runs from Treaty Indian fishing can range from 0.6 to 13.2 percent.  *See* 2005 EA, AR Doc. 2012-342, at 66.  As with the 2003 and 2007 EAs, non-Indian fishing would be mark selective, meaning that any naturally spawned listed fish must be released if accidentally caught.

NMFS concluded that the plans would have "minimal adverse effects on Listed Salmonid [populations] in the Columbia River Basin, and substantial beneficial effects on cultural and

economic resources."  2005 EA, AR Doc. 2012-342, at 79.[11]  NMFS acknowledged that "[t]he

ESA-listed salmonids in the Columbia River Basin *will be adversely affected* by the proposed

action. However, based on the NMFS biological opinion analyzing the proposed action under

section 7 of the ESA, the proposed action *will not jeopardize the continued existence*" of any of

the protected salmonid populations.  *Id.* at 80 (emphasis added).  Ultimately, NMFS found that

the fisheries would not significantly impact the quality of the human environment (another

"FONSI," in the language of NEPA).  2005 EA, AR Doc. 2012-342, at 81.[12]

Plaintiffs argue that NMFS's FONSIs in these three EAs conflict with its determination

that pinniped predation at Bonneville Dam, which has ranged from 1 percent to 4.2 percent of the

protected salmonids passing the dam each year since 2003, has a "significant negative impact on

the decline or recovery" of the listed species.  *See* Section 120 Report, AR Doc. 2012-235, at 6-

7.  Preliminarily, the quantitative differences between these categories of impacts are not as

significant as they may at first appear.  Because pinniped predation is measured by direct

observation, the reported predation rate underrepresents the actual adverse impact caused by

---

[11] In particular, NMFS emphasized the need "to provide fishing opportunities to Oregon and Washington states and the tribes, and to uphold Treaty and Trust obligations to the tribes." 2005 EA, AR Doc. 2012-342, at 2.  NMFS explained that it has "a legal obligation to support Columbia River Tribes in efforts to preserve and rebuild Treaty salmon fisheries in the Tribes' usual and accustomed fishing areas consistent with necessary and appropriate conservation constrain[t]s."  *Id.*  Further, NMFS noted that "[r]ecreational and commercial fishing are important socially and economically in the states of Oregon and Washington; this has been recognized by NMFS in its mission statement [and] its policies."  *Id.* at 5.

[12] Plaintiffs repeatedly quote out of context the finding in this EA that "[c]umulative impacts from NMFS' Proposed Action would be *minor if at all measurable*."  2005 EA, AR Doc. 2012-342, at 69 (emphasis added).  This is not the equivalent of a finding that the fisheries harvest itself is "minor if at all measurable."  Rather, in the context of a cumulative impacts analysis, NMFS explained that it did not anticipate that the proposed action, which reflected a further decrease in harvest rates, would alter significantly the cumulative impacts on fish, particularly given the proposed action's emphasis on reducing harvest rates when run sizes are low.  *See id.*

pinnipeds.  *See id.* at 5-6 & n.1, 8.  Compared to the observed predation rate of 3,557 salmonids

in 2011, NMFS has estimated potential consumption by pinnipeds to range from 2,877 up to

9,590 salmonids per year.  *Id.* at 7-8.[13]  In contrast, the fisheries EAs relied on conservative

estimates of delayed mortalities that may result from the catch and release of fish.  But regardless

of the quantitative similarities or dissimilarities between these causes of salmonid mortality,

NMFS has provided two additional explanations for any apparent inconsistencies among its

findings, to which the Court now turns.

### (c)  *Differences in Statutory Schemes*

First, NMFS has explained that the NEPA and ESA standards differ from the MMPA

standard found in Section 120.  *See, e.g.*, Section 120 Report, AR Doc. 2012-235, at 30-31; 76

Fed. Reg. at 56,170-71.  NMFS views NEPA and the ESA as having "broad mandates" that

require evaluating the effects of a proposed action within the context of the larger environment

or the entire species.  76 Fed. Reg. at 56,170.  "In contrast, section 120 focuses solely on

pinniped predation on at-risk salmonids" at a specific geographic location.  *Id.* at 56,170-71.

In particular, NMFS explained that the "human environment" considered under NEPA is

defined broadly in the regulations to include not just the natural environment, but also the

relationship of people to the environment, and that the term "significantly" requires

consideration of "a multitude of factors," not all of them biological.  Section 120 Report, AR

Doc. 2012-235, at 30; *see also Locke*, 626 F.3d at 1056 ("[A]lthough both statutes speak of

significance, the legal standards under the MMPA and NEPA are distinct.").  NMFS stressed that

---

[13] In general terms, this estimate was derived from the number of CSL at the dam, the
length of their stay, and a range of daily consumption based primarily on observation of
individual sea lions.  *See* Section 120 Report, AR Doc. 2012-235, at 8 & n.3.

its fisheries EAs found that the proposed actions (the Fishery Plans) *would* adversely affect

protected salmonids, which is consistent with its Section 120 finding.  Section 120 Report, AR

Doc. 2012-235, at 30.  Taking into account the social, cultural, and economic context, however,

NMFS ultimately concluded in the EAs that the Fishery Plans would not *significantly* affect the

*human environment*.  *See id.*  Given the broader meaning of "significantly" under NEPA, that

determination is not necessarily inconsistent with NMFS's Section 120 finding.  *See Locke*, 626

F.3d at 1056 n.10 ("[A] finding of significance under the MMPA does not ipso facto mandate a

finding of significance under NEPA.").

Regarding the ESA, NMFS explained that "[a]n action may not jeopardize the continued

existence of a species …, even though it has significant adverse effects to a listed individual or

group of individuals."  76 Fed. Reg. at 56,171.  In other words, a finding that pinniped predation

is having a significant negative impact on the decline or recovery of protected salmonids does

not mean that pinniped predation is *jeopardizing* those salmonids, as the term is used in the ESA

context.  NMFS's Section 120 finding is therefore consistent with the agency's uniform findings

that fisheries *will adversely affect* protected salmonids but will not *jeopardize* the species.  *See*

Section 120 Report, AR Doc. 2012-235, at 30-31.[14]

Based on these explanations, set forth in NMFS's Section 120 Report as well as in a

Federal Register notice that was open to public comment, the Court concludes that NMFS has

_____

[14] Plaintiffs assert that NMFS concluded in a biological opinion that the *United States v. Oregon* fisheries' take "is not likely to adversely affect" the listed fish.  Plfs.' Combined Mem. in Opp'n at 17-18.  Plaintiffs misunderstand or misread the biological opinion.  The finding quoted by Plaintiffs states only that the fisheries would not adversely affect essential fish *habitat*. *See* BiOp on Impacts of Treaty Indian and Non-Indian Fisheries, AR Doc. 2012-343, at 125. The entire biological opinion and the associated ITS were premised on the finding that the fisheries *would* adversely affect the salmonids, even though NMFS ultimately concluded that the fisheries "are not likely to jeopardize the continued existence" of the listed species.  *Id.* at 115.

adequately explained how the apparent inconsistencies among its findings can be reconciled in light of the different statutory standards applied under NEPA, the ESA, and the MMPA.

### (d)     Qualitative Differences in Circumstances

Second, even if the statutory standards were equivalent, NMFS has also explained how pinniped predation could significantly affect a species' recovery while greater mortality rates caused by other sources might *not* significantly affect that species' recovery. NMFS has determined that a sea lion's "take" of one protected fish has a greater negative impact on the species' survival than a fisherman's "take" of one protected fish. *See* Section 120 Report, AR Doc. 2012-235, at 31. Thus, NMFS argues that the significance of the fisheries' impacts on protected fish cannot be directly compared to the impacts of pinniped predation. NMFS provides two reasons for why this is so.

First, fisheries are managed, meaning that they are monitored and can be reduced mid-season if run sizes are smaller than expected, while pinnipeds do not adjust their predation rates depending on the fragility or strength of the salmonid runs. *See id.* at 24-25, 28-29, 31. Plaintiffs argue that fisheries are not truly controllable; they note instances when harvest rates were decreased mid-season due to smaller than expected runs, yet actual harvest rates exceeded the lowered limits. Such examples, however, do not demonstrate that fisheries are uncontrollable: the fisheries are responsive to changes in run size even if such responsiveness is not perfect. It is reasonable for NMFS to conclude that it can exert more control over fishery takes than it can over pinniped predation in years when runs are unexpectedly low.

Second, fisheries can be targeted to protect specific sub-populations of fish, for example by closing particular spawning grounds either seasonally or year-round. *See id.* at 29. Pinniped

predation, on the other hand, can have a disproportionate impact on early or late arriving fish, which represent discrete subpopulations of listed salmonids. *Id.* at 31. According to NMFS, pinniped predation that disproportionately affects these discrete populations and that also cannot be controlled when runs are small has a "depensatory effect," meaning that salmonid reproduction becomes less successful as abundance declines.[15]  *Id.*

The Ninth Circuit did "not impose an undue burden on NMFS on remand." *Locke*, 626 F.3d at 1054. By distinguishing the statutory standards and by explaining the qualitative differences between mortalities caused by fisheries and mortalities caused by pinniped predation, NMFS has satisfied the Ninth Circuit's instruction on remand to provide a "cogent explanation" for the seeming inconsistencies across its findings. *Id*.

### 2. Replacing One Percent Threshold with Time-Limited Authorization

The Ninth Circuit directed NMFS on remand "either to articulate a reasoned decision for its action or to adopt a different action with a reasoned explanation that supports it." *Locke*, 626 F.3d at 1053. Regarding the one-percent predation limit, NMFS chose to adopt a different action and has provided a reasoned explanation to support it.

In its initial decision, NMFS adopted the Task Force's recommendation that lethal removals be suspended if the pinniped predation rate was reduced to one percent of fish passage on average over three years. At the time, NMFS noted that it was unable to quantify the level at

---

[15] Plaintiffs argue that this reasoning about depensatory effect is speculative. The Court views it instead as a reasonable inference drawn from data indicating, for example, that sea sea lions ate between 18 and 48 percent of Chinook arriving at the dam each day between April 1 and April 22, 2011, and that such early run fish are a distinct subpopulation. *See* Section 120 Report, AR Doc. 2012-235, at 15. The Court must defer to the agency's reasonable interpretation of equivocal evidence, particularly when the agency is making predictions within its area of special expertise. *See, e.g.*, *Cent. Ariz. Water Conservation Dist. v. U.S. Envtl. Prot. Agency*, 990 F.2d 1531, 1539-40 (9th Cir. 1993).

which predation would shift from a significant to an insignificant impact, and it explained that

the one-percent limit was "not equivalent to a finding that a 1% predation rate represents a

quantitative level of salmonid predation that is 'significant' under section 120, and that less than

1% would no longer be significant."  Section 120 Report, AR Doc. 2012-235, at 35 (quoting the

2008 Decision Memorandum).

　　　　The Ninth Circuit, however, saw an implicit finding in the one-percent limit of precisely

this nature. On remand, NMFS explained that it still could not quantify the point at which

predation shifts between significant and insignificant impacts.  *See, e.g.*, AR Doc. 2012-230 at

14-15 (responding to the Humane Society's comments and explaining that it was unable to

develop a quantitative standard given available data).  NMFS noted that different salmonid

populations have different vulnerabilities, so an across-the-board standard of significance would

have limited usefulness.  Section 120 Report, AR Doc. 2012-235, at 16.  It also noted that its

inability to measure pinniped predation precisely or predict salmonid runs with a high level of

certainty makes it difficult to identify a bright-line threshold between significance and

insignificance.  *Id.*

　　　　NMFS also reasoned there were no good reasons to retain a quantified threshold.  NMFS

explained that such a limit was not needed to protect the viability of CSL; that the predation rate,

given current trends, was unlikely to dip below one percent *on average over three years* during

the course of the five-year authorization; and that even if the average did dip below one percent,

the predation rate fluctuates and might well rise again the next year.  *See id.* at 35-36.

　　　　Thus, NMFS concluded that in lieu of a quantified lower limit, it would be more

appropriate to evaluate the effectiveness of the program after five years.  The Court concludes

that this reasoning is sufficient to satisfy the Ninth Circuit's instructions on remand and is not arbitrary or capricious.

B.      Interpretation of Section 120

Plaintiffs argue that NMFS's interpretation of the Section 120 standard does not warrant *Chevron* deference because it is a one-time interpretation without precedential value. As the Supreme Court explained in *United States v. Mead Corp.*, 533 U.S. 218 (2001), not all agency interpretations of ambiguous statutes receive *Chevron* deference. *Chevron* applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226-27. The necessary congressional delegation may be implicit, "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *Id.* at 229.

Congress delegated authority to the Commerce Department, which includes NMFS, to "prescribe such regulations as are necessary and appropriate to carry out the purposes" of the MMPA. 16 U.S.C. § 1382(a); *see also id.* § 1373(a) (empowering Secretary of Commerce to regulate the taking of marine mammals "as he deems necessary and appropriate to insure that such taking will not be to the disadvantage of those species and population stocks and will be consistent with the purposes and policies" of the MMPA). Congress therefore expected this agency to "speak with the force of law" when addressing ambiguity or filling gaps in the statutory language. *See Mead*, 533 U.S. at 229.

Further, NMFS exercised that authority when it promulgated this interpretation.  In notice published in the Federal Register and open to public comment, NMFS stated that Congress had not given clear guidance on the meaning of "significant negative impact" and that it proposed interpreting the phrase as requiring an impact on the decline or recovery of at-risk salmonids that is "'meaningful' and not 'insignificant' or 'meaningless.'"  76 Fed. Reg. at 56,170.  NMFS subsequently applied this interpretation in its decision authorizing the States to lethally remove CSL at Bonneville Dam.

Thus, this is a case "where the agency focuse[d] fully and directly upon the issue, where the agency use[d] full notice-and-comment procedures to promulgate a rule, where the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007).[16]  In such cases, "a court ordinarily assumes that Congress intended it to defer to the agency's determination," *id.* at 173-74, and the Court does so here.

Turning to the *Chevron* two-step framework, the Court finds at step one that the statute is ambiguous.  Plaintiffs do not appear to disagree, but they argue that NMFS cannot claim both that the statute is ambiguous and that it adopts the "plain meaning" of the word "significant." *See* 76 Fed. Reg. at 56,170 (proposing "that the plain meaning of the term 'significant negative impact' as used in section 120 should be employed").  The Court does not see a contradiction in the agency's approach. NMFS did not assert that the meaning of the standard was plain, only that

---

[16] *Long Island Care at Home* also included as a factor, "[w]here an agency rule sets forth important individual rights and duties."  551 U.S. at 173.  Such a factor is not directly applicable here, where the ambiguous statute does not speak to important individual rights or duties, but the Court notes that Section 120 does set forth an important conservation standard, the significance of which is underscored by the present litigation.

it chose to apply a particular dictionary definition—rather than an alternative dictionary definition, or a colloquial, contextual, or scientific gloss—to a particular word in an ambiguous statutory provision.

At *Chevron* step two, Plaintiffs challenge the reasonableness of NMFS's interpretation on several grounds.  First, they argue that defining "significant" to mean "meaningful," "not insignificant," and "not meaningless" effectively renders the adjective "significant" superfluous.  Not all impacts are "meaningful," however; they could be negligible or ineffectual.  Indeed, other provisions of the MMPA refer to "negligible impact" and "insignificant levels [of impact] approaching a zero mortality and serious injury rate."  *See* 16 U.S.C. §§ 1371(a)(5), 1387(a).  Within the context of this statute, then, anything more than "negligible" could be considered "significant."  The Court also notes that the dictionary definition of "significant" supports NMFS's interpretation and is more restrained than the meaning that Plaintiffs urge the Court to apply.  *See Webster's Third New International Dictionary* 2116 (2002) (defining "significant" as, *inter alia*, "having meaning," "having or likely to have influence or effect," or "probably caused by something other than mere chance").

Second, Plaintiffs argue that the "significant negative impact" standard sets a high bar akin to the "jeopardize" standard used in the ESA.  The structure of Section 120, however, suggests that Congress did not intend for the agency to apply a jeopardy-like standard.  For one thing, Congress did not use the language of the ESA's well-known jeopardy standard: pinniped protection gives way to salmonid protection under Section 120 when pinnipeds are impacting salmonid survival or recovery to a significant degree, even if that impact does not rise to the level of appreciably reducing the likelihood that the salmonids will survive and recover.  Indeed,

Section 120 allows the protection of salmonids to take precedence over that of pinnipeds even before the salmonids are listed as threatened or endangered under the ESA, which indicates that Congress intended the Section 120 standard to trigger action before the problem escalated to jeopardizing salmonid populations.  *See* 16 U.S.C. § 1389(b)(1)(B).  It is thus reasonable for NMFS to interpret "significant negative impact" to mean something less than jeopardy.

Finally, Plaintiffs argue that a quantitative standard is most appropriate.  They acknowledge, however, that one is not required.  *See* Plfs.' Combined Mem. in Opp'n at 18; *cf. Ctr. for Biological Diversity*, 695 F.3d at 905-06 (NMFS did not have to interpret a "small numbers" standard in the MMPA as requiring quantification, particularly as Congress explicitly required quantified estimates in other MMPA provisions).  Plaintiffs may prefer a different interpretation, but "[a] court must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation."  *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. --- (2013), 2013 WL 215485, at *9.  Because the Court finds that NMFS's construction of the statute is reasonable, it defers to the agency's interpretation of "significant negative impact."

> C.     *Application of Section 120*

The Court's review of NMFS's application of Section 120 is narrow, and the Court must not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In applying the Section 120 standard to the States' applications, NMFS considered seven qualitative factors.[17]  The Court finds that NMFS relied on relevant factors, did not fail to

---

[17] The Court considers these factors to be relevant to NMFS's application of the Section 120 standard, rather than part of its interpretation of it.  *See* 76 Fed. Reg. at 56,170 (proposing that the application of Section 120 "should also be informed by" these seven factors).

consider an important part of the problem, and offered an explanation that was both plausible and consistent with the evidence before it.  *See id.*  NMFS's decision is therefore not arbitrary or capricious.

First, NMFS noted that pinniped predation is measurable, growing, and unpredictable. *See* Section 120 Report, AR Doc. 2012-235, at 13-14 (considering the factors of whether "[t]he predation is measurable, has grown since 2002, and could continue to increase if not addressed" and that "[i]n 2010, California sea lion[s] reached their highest numbers since 2004, thereby demonstrating that their numbers are as yet unpredictable and can easily grow").  Plaintiffs argue that the data suggest instead a downward trend in pinniped predation.  The data could be interpreted either way, as the number of sea lions present at the dam each year, the average length of their stay, the number of salmonids they are observed to kill, and the percentage of the fish passing the dam consumed by the sea lions has fluctuated over the years.  Because NMFS's interpretation of that data is plausible, the Court must accept the agency's reading.  *See Lands Council v. McNair*, 537 F.3d 981, 993-94 (9th Cir. 2008) (*en banc*) (the court must defer to an agency's technical expertise, as long as there is no clear error in judgment).

Second, NMFS linked the impact of predation to the survival and recovery of the fish. *See* Section 120 Report, AR Doc. 2012-235, at 14 (considering the factor of whether "[t]he level

---

The Court also understands these seven factors to be distinct from the four factors listed in Section 120(d).  Congress's decision to list the Seection 120(d) factors in a separate subsection from the "significant negative impact" standard suggests it saw the agency making two determinations: first, whether there is a significant negative impact, and second, whether these additional factors separately warrant granting or denying a state's application to remove the identified pinnipeds.  *See Ctr. for Biological Diversity*, 695 F.3d at 903-04 (applying a similar analysis to another provision of the MMPA).  Nevertheless, evidence that relates to the four Section 120(d) factors may also inform NMFS's determination of whether the Section 120(b) standard has independently been met.  *See id.* at 907.

of adult salmonid mortality is sufficiently large to have a measurable effect on the numbers of listed adult salmonids contributing to the productivity of the affected [sub-populations]"). NMFS has previously estimated the "spawner returns needed to achieve a low likelihood of extinction and adequate potential for recovery," and it concluded that the "[l]oss of potential spawners to predation on the order of that observed at Bonneville Dam can affect the ability to achieve the productivity improvements needed." *Id.* This is a reasonable conclusion relevant to the Section 120 inquiry.

Third, NMFS took into account the pinnipeds' "disproportionate impact on early and late run fish, and on all populations at low run sizes." *Id.* This "depensatory effect" means that reproduction is less successful as abundance declines, which increases the risk that a protected population could enter an "extinction vortex" when runs are low. *Id.*; *see also id.* at 14-15 (considering the factor of whether "[t]he predation rate from California sea lions increases when salmonid run sizes decrease"). This is a fair inference to draw from the cyclical nature of salmonid runs and the unmanageable rate of pinniped predation.

Fourth, NMFS considered that "[t]he mortality rate for listed salmonids is comparable to mortality rates from other sources that have resulted in the agency using its ESA authorities to reduce the impact." *Id.* at 15. Plaintiffs challenge this factor, arguing that it confuses the ESA standard with the Section 120 standard, but the comparison drawn is merely qualitative. NMFS has emphasized repeatedly its policy of reducing all sources of salmonid mortality, *see, e.g.*, Decision Mem., AR Doc. 2012-239, at 2-3, and the point at which the agency acted to reduce mortalities in other contexts is relevant to determining whether pinniped predation is sufficiently significant to warrant corrective action as well.

OPINION AND ORDER, Page 28

The two remaining factors have less obvious relevance.  One, whether "[n]on-lethal deterrence efforts have been unsuccessful at reducing the number of sea lions or amount of predation," risks incorporating part of the Section 120(d) analysis into the Section 120(b) standard.[18]  Whether predation can be controlled by less serious means can, however, be indicative of the problem's intractability; thus, the Court cannot say the agency erred in considering this factor.  The final factor, whether "CSL and [Steller sea lion] predation on at-risk salmonids at Bonneville Dam has a combined effect," raises an interesting question about how to interpret the Section 120 standard when one or more species of predators are excluded from lethal removal under Section 120.  Contrary to NMFS's assertion, this issue was not clearly decided by the Ninth Circuit.  When the Ninth Circuit accepted NMFS's two-step application of the Section 120 standard, it described the first step as determining "whether <u>California sea lions</u> <u>*collectively*</u> were having a significant negative impact on listed salmonids."  *Locke*, 626 F.3d at 1054-55 (italicized emphasis in original; underlining added).  Whether NMFS can also count Steller sea lion predation in this first step is therefore an open question.  The Court need not resolve that question, however, because the remainder of NMFS's analysis is sufficient to support its conclusion that CSL are having a significant negative impact on the decline or recovery of at-risk salmonids.

Applying the APA's narrow scope of review, the Court holds that NMFS has considered the relevant data and articulated a satisfactory explanation for its decision.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  It therefore denies Plaintiffs' motion for summary judgment and grants NMFS's and the States' motions for summary judgment on the MMPA claim.

---

[18] *See* note 17, *supra*.

**II.    Claims Regarding Incidental Takes of Steller Sea Lions**

Under their second and third claims, Plaintiffs argue that the lethal removal of CSL will result in takings of Steller sea lions and that NMFS's failure to authorize such incidental takings through an MMPA permit and through an ESA incidental take statement ("ITS") was arbitrary or capricious in violation of the APA.  During briefing on the parties' cross-motions for summary judgment, in response to the Ninth Circuit's decision in *Center for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012), NMFS issued a revised ITS covering the take of Steller sea lions incidental to nonlethal deterrence measures at Bonneville Dam.  *See* Revised Incidental Take Statement (Sept. 17, 2012), Doc. No. 84, Ex. 6 (hereafter "Revised ITS").  Plaintiffs acknowledged at oral argument that this revised ITS mooted their third claim for relief.  Hr'g Tr., Oct. 19, 2012 (Doc. No. 88), at 35-36.  They continue to assert, however, their second claim for relief based on NMFS's failure to authorize any incidental take under the MMPA.  *Id.*

The MMPA generally prohibits any take of a marine mammal unless a permit or waiver is obtained under 16 U.S.C. § 1371.  Under the MMPA, to "take" means to "harass, hunt, capture, or kill" a marine mammal, which includes "the restraint or detention of a marine mammal, no matter how temporary."  16 U.S.C. § 1362(13); 50 C.F.R. § 216.3.  "Harassment" is further defined as "any act of pursuit, torment, or annoyance which … has the potential to injure a marine mammal … or … has the potential to disturb a marine mammal … by causing disruption of behavioral patterns, including … feeding …."  16 U.S.C. § 1362(18)(A).  Plaintiffs argue that the lethal removal of CSL may result in takes of Steller sea lions.  For example, in order to euthanize predatory CSL, the States trap the CSL on platforms set out in the tailrace of Bonneville Dam, and it is possible that Steller sea lions could be trapped along with the targeted

CSL.  Plaintiffs argue that any such takes must be pre-approved under 16 U.S.C. § 1371(a)(5), which allows the Secretary to permit takes of "small numbers" of marine mammals if the take would have a "negligible impact" on the species.  NMFS and the States argue that a § 1371(a)(5) permit is not required because the lethal removal activities will not result in the impermissible take of Steller sea lions, and they also argue that Plaintiffs lack standing to bring this claim.  The Court must first address the issue of standing.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

A.      *Standing*

Plaintiffs bear the burden of establishing that they satisfy both constitutional and statutory standing requirements.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990).[19]  To establish constitutional standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth*, 528 U.S. at 180-81.  Because their standing is challenged at the summary judgment stage, Plaintiffs must set forth specific facts that show each of the elements of standing.  *Defenders of Wildlife*, 504 U.S. at 561; *Nat'l Wildlife Fed'n*, 497 U.S. at 884-85.

Only one plaintiff need have standing for this Court to have jurisdiction. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Public Lands for*

_____

[19] Defendants do not challenge Plaintiffs' statutory standing, which requires a plaintiff's injury to fall within the "zone of interest" of the statute.  *Nat'l Wildlife Fed'n*, 497 U.S. at 883.  The Court agrees that Plaintiffs have statutory standing to bring this MMPA claim.

*the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1197 (9th Cir. 2012).  "An association

has standing to bring suit on behalf of its members when its members would otherwise have

standing to sue in their own right, the interests at stake are germane to the organization's

purpose, and neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit."  *Friends of the Earth*, 528 U.S. at 181.  The Court thus

focuses its analysis on the standing of the Humane Society based on the declaration of its

member Bernadette Price.

Ms. Price's declaration establishes an injury to her recreational and aesthetic interests,

which is sufficient to satisfy the concrete harm requirement.  *See, e.g.*, *Jayne v. Sherman*, --- F.3d

----, 2013 WL 64357, at *4 (9th Cir. Jan. 7, 2013) (*per curiam*).  According to Ms. Price's

declaration, her house is located on the Columbia River "a couple miles downstream of the

Bonneville Dam," and she enjoys watching sea lions (presumably both CSL and Steller sea

lions) from her backyard.  *See* Decl. Bernadette Price, Doc. No. 25, Ex. 21, ¶ 4.  She photographs

and videotapes sea lions from her home and from Bonneville Dam.  *Id.*  In the late spring, she

kayaks in the Columbia River "at least 3-4 times a month," and she values the encounters she has

with the sea lions during those excursions.  *Id.* ¶ 5.  Whenever friends or family visit her from

out of town, she takes them to see the sea lions at Bonneville Dam.  *Id.* ¶ 7.  She worries that she

may come across a wounded sea lion, and the fear of such an encounter has already reduced her

ability to enjoy recreating in and appreciating the river near her house and the dam.  *Id.* ¶¶ 9-10.

In sum, Ms. Price has established that she "had repeatedly visited an area affected by a project,

that [s]he had concrete plans to do so again, and that [her] recreational or aesthetic interests

would be harmed if the project went forward."  *Jayne*, 2013 WL 64357, at *4 (quoting

*Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (internal quotation marks omitted)).  This is sufficient to constitute an injury in fact.

Furthermore, that injury is fairly traceable to the challenged action.  The letters of authorization could potentially result in takes of Steller sea lions that are not otherwise allowed absent a § 1371(a)(5) permit.  NMFS and the States dispute this claim on two grounds, neither of which persuades the Court.

First, Defendants argue that the letters of authorization will not result in any takes of Steller sea lions that are not otherwise already allowed by 16 U.S.C. § 1379(h).  Section 1379(h) exempts from the MMPA's prohibitions the take of a marine mammal by a government employee "in the course of his or her duties … if such taking *is for … the nonlethal removal* of nuisance animals."  16 U.S.C. § 1379(h) (emphasis added).  The plain language of the statute precludes Defendants' reading of it.  If Steller sea lions are affected by the lethal removal activities authorized by NMFS, and if those effects rise to the level of a "take" under the MMPA, that take would be "for" the *lethal* removal of nuisance animals, namely the California sea lions.[20]

Similarly, Defendants point to MMPA permits already held by the States that allow the States to trap Steller sea lions for research purposes.  *See* Permit No. 14326-02 to Take Protected

---

[20] On the other hand, the plain language of § 1379(h) also precludes Plaintiffs' argument that takes of sea lions due to *nonlethal* deterrence activities necessitates any additional permits or other findings, including that the takings will occur in a "humane manner."  Section 1379(h) explicitly exempts all takes related to nonlethal deterrence activities from the other provisions of the MMPA, including § 1371(a)(5)'s permitting process.  *See* 16 U.S.C. § 1379(h) ("Nothing in this subchapter [which includes § 1371] shall prevent a … government official … from taking … a marine mammal in a humane manner … if such taking is for … the nonlethal removal of nuisance animals.").

Species for Scientific Purposes, Doc. No. 55, Ex. 6 (hereafter "Permit No. 14326-02").[21]  The

Court is not convinced that all potential captures of Steller sea lions incidental to the lethal

removal of CSL will be conducted by the requisite research personnel, in the requisite manner,

and for the requisite purposes as set forth in Permit No. 14326-02, or that such incidental takes

will be properly accounted for under that permit's reporting requirements.  *See, e.g.*, *id.* at 3[22]

("The activities authorized herein must occur by the means, in the areas, and *for the purposes set

forth* in the permit application…." (emphasis added)); *id.* at 8-9 (restricting the personnel who

may conduct the permitted activities).  More generally, the potential captures of Steller sea lions

alongside targeted CSL would not be incidental to the permitted research; that limited trappings

are allowed under the research permits does not mean that *these* potential trappings, incidental to

the lethal removal of CSL, are excused from the MMPA's restrictions.

        Second, Defendants argue that the letters of authorization *only* authorize the euthanizing

or shooting of the CSL, and not the trapping of sea lions that precedes the euthanasia.  Thus,

because Defendants are confident that no Steller sea lion will be euthanized or shot accidentally,

they argue that there will be *no* impact on Steller sea lions incidental to the authorized activities.

That reading of the letters of authorization is too cramped: the preliminary trapping of the CSL is

an integral component to euthanizing the CSL in a humane manner.  Indeed, if the capture of the

CSL is not covered by the letters of authorization, it is not clear under what authority the States

could trap them in order to euthanize them: because the trapping would be for the purpose of

---

        [21] Another research permit held by the States and cited by Defendants only authorizes the
"[i]ncidental harassment [of SSL] *during research directed at pinnipeds*."  Permit No. 13430-01
to Take Protected Species for Scientific Purposes, Doc. No. 55, Ex. 5, at 17 (emphasis added).
The lethal removal of CSL would not appear to constitute such research.

        [22] The cited pagination refers to the exhibit as whole rather than the permit's internal
pagination.

killing the CSL, those takes are not covered by § 1379(h)'s exception for *nonlethal* deterrence of nuisance animals or by any research permit.  Defendants' litigation position is also belied by NMFS's prior environmental documents, which distinguished between effects to Steller sea lions resulting from nonlethal deterrence activities and those resulting from lethal deterrence activities directed toward CSL.  *See* Finding of No Significant Impact (Mar. 12, 2008), AR Doc. 2012-10, at 8-3 ("The proposed action will adversely affect a small number of listed individual Steller sea lions that will be disturbed by non-lethal deterrence activities directed at pinnipeds below the dam *and lethal deterrence activities directed at California sea lions*." (emphasis added)); Final Environmental Assessment (Mar. 12, 2008), AR Doc. 2012-11, at 4-8 (hereafter "2008 EA") (concluding that Section 120 authorizations would increase displacement of Steller sea lions). NMFS has previously acknowledged that the lethal removal activities may have an impact on Steller sea lions *separate from* the nonlethal deterrence of pinnipeds more generally.  The magnitude and import of those effects is a merits question.

The final requirement of constitutional standing is redressability.  The injury in fact caused by the challenged action can likely be addressed by an order from this Court directing NMFS to undertake a § 1371(a)(5) process in relation to its Section 120 authorizations, if such is indeed required.  This is sufficient.

Ms. Price would therefore have had standing to bring this claim in her own right.  In addition, the interests at stake are germane to the Humane Society's associational purpose, and the individual participation of Humane Society's members in this lawsuit is not required.  Thus, the Humane Society has organizational standing.  *See Friends of the Earth*, 528 U.S. at 181.

B.    *Merits*

The Court next considers whether NMFS acted arbitrarily or capriciously when it concluded that no additional authorization was needed under the MMPA to allow for incidental takes of Steller sea lions.  Although it is a close question, the Court concludes that NMFS examined the relevant data and articulated a satisfactory explanation in determining that the letters of authorization would not result in the incidental harassment, capturing, or killing of Steller sea lions.

First, the record supports NMFS's conclusion that no Steller sea lions will be accidentally killed or injured as part of the lethal removal program.  There is no reason to anticipate that the wrong animal will be euthanized or shot, given the specificity with which targeted CSL are identified for lethal removal.[23]  The trapping of CSL in order to euthanize or shoot them, however, could result in harm to Steller sea lions.  In 2008, under the prior lethal removal authorization, two Steller sea lions were accidentally captured and died from heat exhaustion before they were discovered in the traps.  NMFS instituted new safeguards following the incident and reinitiated ESA consultation to evaluate the risk of further accidental deaths.  Concluding that "[u]nder the new protocol there is only a remote chance that the trap doors may accidentally be closed," NMFS determined that "[i]t is therefore extremely unlikely that Steller sea lions will

---

[23] Plaintiffs quote from the 2008 EA in arguing that Steller sea lions may be mistakenly shot, just as they argued before Judge Mosman when challenging the prior lethal removal authorizations five years ago.  As Judge Mosman explained then, "plaintiffs either misinterpret or misrepresent the EA.  Plaintiffs quote from alternative four; however, NMFS proposed alternative three and authorized the states to proceed under that alternative."  *Humane Soc'y of the U.S. v. Gutierrez*, 625 F. Supp. 2d 1052, 1069 (D. Or. 2008).  Plaintiffs continue to quote the identical passage from the rejected alternative in the 2008 EA.  The Court is unaware of any record evidence suggesting that Steller sea lions may be accidentally shot under the lethal removal authorizations as issued.

be incidentally or accidentally killed by the proposed action." ESA Section 7 Consultation (Feb. 20, 2009), AR Doc. 2012-43, at 40; *see also id.* at 30 ("With these safeguards in place there is only a remote likelihood of Steller sea lions being killed or injured."); Supplemental Biological Opinion (Feb. 29, 2012), AR Doc. 2012-359, at AR 2012-15395 (hereafter "2012 BiOp")[24] (noting that no Steller sea lions have been injured or killed from trapping operations since the institution of the safeguards in 2009 and stating that the safeguards would remain in place under the new authorization).[25]

Second, it is reasonable to conclude that the lethal removal program will not cause additional harassment of Steller sea lions. To the extent that lethal removal activities may disrupt feeding patterns, that effect would be inextricably intertwined with Defendants' continuing and permissible efforts to deter pinniped predation under § 1379(h). *See* 2012 BiOp, AR Doc. 2012-359, at AR 2012-15395 (anticipating up to 889 harassment takes of Steller sea lions per year due to nonlethal deterrence activities). To the extent that the letters of authorization allow the shooting of predatory CSL, NMFS argues—and the Court accepts—that any discharge of firearms must separately comply with the ESA prohibition on discharging firearms within 100 yards of a Steller sea lion. *See* 50 C.F.R. § 223.202(a)(1). The States' compliance with the ESA regulations would thus provide further assurance that any use of firearms would not harass Steller sea lions.[26]

---

[24] Because the supplemental biological opinion is not separately paginated, the Court refers to the page number assigned for purposes of the summary judgment record.

[25] Any doubt that the trapping safeguards are required under the new letters of authorization has been dispelled by the revised ITS, which makes the revised trapping protocols nondiscretionary. Revised ITS, Doc. No. 84-5, at 29.

[26] This concern is likely hypothetical because the States have never used their lethal removal authority to shoot a CSL.

Finally, an MMPA "take" occurs whenever a marine mammal is detained or restrained, no matter how briefly.  50 C.F.R. § 216.3.  As previously noted, the 2008 environmental documents acknowledge that Steller sea lions may be disturbed or displaced by lethal removal activities directed at CSL, but there is no clear finding that Steller sea lions will be trapped along with the targeted CSL, although such accidental trapping did occur at least once, with fatal results, in May 2008.  The updated trapping protocol, intended to prevent similar accidents, has been in place since 2009 and is now mandated by the revised ITS.  Since its implementation, only one Steller sea lion has been captured in a Bonneville Dam trap pursuant to *nonlethal* deterrence activities.  Revised ITS, Doc. No. 84-5, at 28.

The Court recognizes that there is some ambiguity in the record regarding the possibility of incidental capture of Steller sea lions.  The 2012 BiOp, the 2012 Decision Memorandum, and the Revised ITS all acknowledge that Steller sea lions have been and may be incidentally captured, but they all imply that such captures will result from nonlethal deterrence measures.  It may be that this determination reflects NMFS's position that the letters of authorization only authorize the act of killing predatory CSL and that any capture preceding euthanasia is pursuant to nonlethal deterrence activities.  *See, e.g.*, Revised ITS, Doc. No. 84-5, at 28, n.4 (asserting this proposition before concluding that the take of Steller sea lions incidental to lethal removal activities is unlikely).  The Court has rejected that position.  Nonetheless, there is no clear evidence in the record that the lethal removal activities will result in incidental captures of Steller sea lions.

In sum, based on the record before the agency, it was not arbitrary or capricious for NMFS to conclude that the "[t]ake of Steller sea lions from lethal activities authorized for

California sea lions is not anticipated," Revised ITS, Doc. No. 84-5, at 28, n.4, and that no

additional MMPA permit is required. The Court denies Plaintiffs' motion for summary judgment

and grants NMFS's and the States' motions for summary judgment as to the second claim.

## III.    NEPA Claim

Before issuing the 2012 letters of authorization, NMFS prepared a supplemental

information report ("SIR," AR Doc. 2012-233) to evaluate whether it needed to supplement its

2008 EA.  In their final claim, Plaintiffs argue that NMFS erred when it concluded that its 2008

EA and FONSI were still valid and that it did not need to prepare a supplemental EA before

moving forward with the new authorizations.

The regulations implementing NEPA direct agencies to prepare supplements in two

situations: if "[t]he agency makes substantial changes in the proposed action that are relevant to

environmental concerns," or if "[t]here are significant new circumstances or information relevant

to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R.

§ 1502.9(c)(1).[27]  This requirement is limited; "an agency need not supplement an EIS [or an

EA] every time new information comes to light after the EIS [or EA] is finalized."  *Marsh v. Or.*

*Natural Res. Council*, 490 U.S. 360, 373 (1989).  An agency may prepare an SIR, as NMFS did

here, to determine "whether new information or changed circumstances require the preparation

of a supplemental EA or EIS."  *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566 (9th Cir.

2000).  NMFS's conclusion, based on its SIR, that no supplement was required is reviewed by

---

[27] Although this regulation refers only to supplementing an environmental impact
statement, the Ninth Circuit has held that this standard for supplementation applies equally to
EAs. *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000).

this Court under the APA's arbitrary or capricious standard.  *Marsh*, 490 U.S. at 375-76; *Price*

*Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 (9th Cir. 1997).[28]

A. *Substantial Changes*

In its SIR, NMFS identified two changes between its original letters of authorization,

which were analyzed in the 2008 EA, and its proposed new letters of authorization.  First, NMFS

eliminated the one-percent average predation threshold for suspending lethal removals activities.

Second, NMFS modified its definition of predatory pinnipeds eligible for lethal removal to

include CSL observed eating salmonids in the dam's fish ladders or above the dam (in its

"forebay").  NMFS concluded in the SIR that neither of these changes amounted to "substantial

changes … that are relevant to environmental concerns."  40 C.F.R. § 1502.9(c)(1)(i).

NMFS provided two persuasive reasons in the SIR for why its elimination of the one-

percent threshold was not a substantial change.  First, NMFS explained that the elimination of

the threshold would likely have no practical effect during the five-year authorization period.

Considering the data for pinniped predation at Bonneville Dam over the last ten years, NMFS

reasoned as follows:

> The 3-year running average predation rate for 2008-2010 was … 2.44%.  In
> 2011 the predation rate dropped to 1.6%, bringing the 3-year running
> average to 2.04%, which again exceeded the threshold.  At current levels of
> pinniped predation (6,000 salmonids consumed in 2010 and 3,500 in 2011),
> consistent run sizes of 350,000 to 600,000 fish would be needed to achieve
> a 1% threshold, which is unlikely, given that the 2002-2011 average is well

---

[28] Plaintiffs argue that they need only raise "substantial questions" about the significance
of new information, citing *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 561-62
(9th Cir. 2006).  In the passage relied on by Plaintiffs, however, the court was discussing in dicta
the standard for when an environmental impact statement must be prepared.  *See id.*  The Court
finds *Klamath Siskiyou Wildlands Center* inapposite both legally and factually and applies the
clear, consistent, and logical direction by the Supreme Court and the Ninth Circuit to review
NEPA decisions under the APA's deferential arbitrary or capricious standard.

> below 200,000.  Conversely, if run sizes were 250,000, a 1% predation rate
> would equate to 2,500 fish.  This level of predation was last seen in 2003.

SIR, AR Doc. 2012-233, at 6.  Thus, NMFS concluded, "[b]ecause it is unlikely that the 1% 3-

year average rate would be achieved during the term of the 5-year authorization, the effects of

the proposed action are likely to be the same, with or without the threshold."  *Id.*

Plaintiffs disagree.  They note that the rate of predation has decreased since 2007, and in

2011, the rate of observed CSL predation was only 1.1 percent of the fish passing Bonneville

Dam.  *See* Section 120 Report, AR Doc. 2012-235, at 6-7.  Plaintiffs' reading of the data is not

wrong, but neither is it inherently right.  Data and statistics are often susceptible to different

interpretations.  For example, although the *rate* of pinniped predation has decreased since 2007,

that trend reflects the smaller run size in 2007 (88,476 in 2007 compared to 223,380 in 2011),

which resulted in a higher predation rate.  As the run sizes have grown larger, the rate of

predation has decreased.  If the *number* of salmonids consumed is considered instead, however,

pinniped predation has increased each year between 2007 and 2010 and decreased only in 2011.

That perspective tells a different story about the trend of pinniped predation at the dam.  Where

the evidence is open to different interpretations, this Court must defer to the agency's

interpretation when it is supported, as it is here, by reasoned analysis and adequate data.  *See*

*Marsh*, 490 U.S. at 377-78; *Price Rd. Neighborhood Ass'n*, 113 F.3d at 1511.

Second, NMFS concluded that eliminating the one-percent threshold would not be a

significant change in terms of environmental concerns because the agency retained another

limitation to protect the vitality of the CSL population.  As with the prior letters of authorization,

the new letters of authorization allow the States to kill no more than one percent of the number of

CSL that could be removed from the wild without affecting the overall abundance, distribution,

or productivity of the population.  Based on a prior determination that 9,200 CSL could be lost

each year without affecting the viability of the population, NMFS would limit the States to no

more than 92 lethal removals per year.  (Under the 2008 letters of authorization, this number was

85).[29]  NMFS concluded that, even if the three-year average predation rate did drop below one

percent, removing the one-percent predation threshold would still have only "inconsequential" or

"imperceptible" impacts on the species.  *See* SIR, AR Doc. 2012-233, at 6.  The Court finds

reasonable NMFS's explanation for why eliminating the one-percent predation threshold was an

insubstantial change that did not necessitate new environmental analysis.

      As for NMFS's change to the definition of predatory pinniped,[30] Plaintiffs offer no

argument for why that change is substantial, and NMFS has adequately explained why it is not.

The SIR noted that few sea lions have been able to overcome deterrence devices and enter the

dam's fish ladders or work their way to the dam's forebay.  Based on past experience, NMFS

concluded that "[t]he revised criteria may hasten the eligibility of individual California sea lions

that may be taken by lethal removal, but it is highly likely that animals entering the fish ladders

and/or ascending above the dam will ultimately be added to the list if they aren't already on it."

SIR, AR Doc. 2012-233, at 7-8.  This explanation is reasonable and supported by specific

examples.  *See id.*  NMFS's conclusion that the expanded definition was an insubstantial change

is not arbitrary or capricious.

---

[29] In practice, while operating under the 2008 letters of authorization, the States were only able to capture and euthanize up to 15 CSL each year.  Thus, both the States and NMFS anticipate that the States will lethally remove no more than 30 CSL each year under the new letters of authorization, rendering this one-percent limit of 92 more theoretical than practical. *See* SIR, AR Doc. 2012-233, at 10.

[30] As noted above, NMFS expanded the definition of predatory pinnipeds to include CSL observed eating salmonids in Bonneville Dam's fish ladders or in its forebay.

B.      *Significant New Information*

Plaintiffs also disagree with NMFS's conclusion that there is no significant new information bearing on the proposed action or its impacts that would warrant supplementing the 2008 EA. First, Plaintiffs point to a new literature review of studies about the potential impacts of non-indigenous fish species that prey on juvenile salmonids (the "Sanderson report," AR Doc. 2012-395). As described in the SIR, the Sanderson report "indicates a potential bias in the allocation of salmon recovery resources toward mitigation of [habitat, harvest, hatcheries, and hydropower] at the expense of a newly identified and potentially significant source of mortality." SIR, AR Doc. 2012-233, at 22. NMFS noted, however, that the information was not new— predation by non-indigenous fish was mentioned in the 2008 EA—and that it did not bear on the proposed action's impact, *i.e.*, how lethally removing CSL at Bonneville Dam would affect the environment. *See id.* at 22-23.

Plaintiffs nonetheless argue that the Sanderson report illuminates information that should be factored into the environmental baseline from which the 2008 EA measured impact. The impacts evaluated by the EA, however, relate to the pinniped-salmonid interaction at Bonneville Dam and the environmental consequences of killing sea lions. A baseline for such an analysis would start from the salmonids' present at-risk status, regardless of the various factors that contribute to that status. Whether the salmonid mortalities are caused by one non-pinniped source or by another would not fundamentally alter the starting point of the EA's analysis. Plaintiffs may be arguing that NMFS did not adequately consider whether other sources of mortality could be reduced first before authorizing the killing of sea lions, but that is a policy disagreement, not a legal one. Section 120 does not require pinniped predation to be greater than

other sources of mortality before NMFS may act.  Because NEPA does not require supplemental review if *significant new* information does not bear *on the proposed action or its impacts*, NMFS's conclusion that the Sanderson report did not warrant supplementation was not arbitrary or capricious.

Finally, Plaintiffs argue that a memorandum describing plans to model the effects of pinniped predation (the "Ferguson memorandum," AR Doc. 2012-288) constitutes significant new information.  The Ferguson memorandum, however, discusses studies that predated the 2008 EA and proposes further research; it does not contain new information, much less significant new information that would alter the analysis of the 2008 EA.

In sum, NMFS provided reasonable explanations for its decision not to prepare a supplemental EA.  That decision was not arbitrary or capricious.  The Court therefore denies Plaintiffs' motion for summary judgment and grants NMFS's and the States' motions for summary judgment as to the NEPA claim.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment (Doc. No. 75) is DENIED, and NFMS's Cross-Motion for Summary Judgment (Doc. No. 77) and the State's Cross-Motion for Summary Judgment (Doc. No. 79) are GRANTED.  This case is dismissed.

DATED this 15th day of February, 2013.


/s/  Michael H. Simon_____
Michael H. Simon
United States District Judge


OPINION AND ORDER, Page 44